## HEYWARD and others *vs.* THE MAYOR. &c. OF THE CITY OF NEW-YORK.

Where private property is taken for a public use by a municipal corporation of varied powers and duties, in the exercise of the right of eminent domain delegated by the state, in a proper case, and the estate which the corporation is authorized to take is a fee simple absolute, for which full compensation is made, the property does not revert to the owner in case the use thereof for public purposes is discontinued.

Property taken by such a corporation for an almshouse establishment, is not subject to the same rule as that which applies to land taken for a road, by a turnpike company.

IN EQUITY. The bill in this cause was filed in the court of chancery, before the vice chancellor of the first circuit, on the 29th of June, 1846. An answer was put in, and a general replication was filed, and proofs were taken. The nature and object of the bill, and the facts appearing from the pleadings and proofs, together with the legal questions arising thereon, are stated in the opinion of the court.

*Moore & Havens*, for the plaintiffs.

*H. E. Davies*, for the defendants.

*By the Court*, EDWARDS, J. In the year 1818, the defendants in this suit were seised and possessed of certain lands and premises situated in the then ninth ward of the city, which were

used and occupied for an almshouse establishment. At that time the wants of the city were supposed to require that the establishment should be enlarged, and that lands lying contiguous thereto should be taken for that purpose. In reference to this supposed necessity, a memorial was presented to the legislature; and on the 21st of April, 1818, an act was passed authorizing the defendants to take posssession of the said lands, on paying the value thereof, to be assessed in the manner directed in a previous act, passed March 29th, 1816; and it was provided that on such payment, the defendants should become seised of the said lands in fee simple absolute. After the passage of this act, and on the 19th of May, 1819, the commissioners appointed under the act made their final report, by which they assessed the value of the property at $13,690; and shortly afterwards that sum was tendered to Mrs. Rogers, the then owner of the lands, and received by her. The defendants then entered into the possession of the property, and continued in the occupation and use of it, for the purposes of an almshouse establishment, until the year 1845, when the establishment was removed to Blackwell's Island, and the lands were sold by the defendants.

Upon this state of facts, the plaintiffs, who are the representatives of Mrs. Rogers, claim that they are entitled to the money received by the defendants upon such sale.

The first ground upon which the plaintiffs rest their claim is, that the property in question was not taken for a *public use,* and that, for that reason, the act of April 21, 1818, was unconstitutional and void.

It is a fundamental principle incident to the sovereignty of a state that, by virtue of the right of eminent domain it may, in a proper case, take private property for public use. But it has never been supposed that the right of eminent domain conferred any greater power than this. The constitution of 1777 contained no provision similar to that contained in the constitution of 1821, in reference to the taking of private property for public use. And even that provision does not profess to define the extent of the right of eminent domain, except that it makes it

Heyward *v.* The Mayor, &c. of New-York.

a condition precedent to its constitutional exercise, that a just compensation shall be made to the party whose property shall be taken. But it has been held by high authority, that there is a restriction upon the legislative power in this respect, distinct from any constitutional provision. In the case of *Wilkinson* v. *Leland,* (2 *Peters,* 657,) the court say that "that government can scarcely be deemed to be free, where the rights of property are left solely dependant upon the will of the legislative body, without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred." And in the case of *Taylor* v. *Porter,* (4 *Hill,* 145,) it was contended by one of the members of the court, that the legislative power over the property of a citizen was restricted to cases of public necessity, by that provision contained in all the constitutions of this state, which declares that no member of the state shall be deprived of any of the rights and privileges secured to any citizen thereof, unless by the law of the land. Again, it has been suggested by distinguished jurists, that real property, being held by grant from government, it would be a violation of contract, and repugnant to the constitution of the United States, to take private property for any other than a public use, without the consent of the owner. (2 *Kent's Comm.* 340. *Beekman* v. *Saratoga Railroad,* 3 *Paige,* 73. *Taylor* v. *Porter,* 4 *Hill,* 149.) And there can be no doubt that an act of the legislature passed anterior to the constitution of the year 1821, delegating the power to take private property, for a use clearly and avowedly private, would be held void upon some, if not all of the grounds above stated.

The question then arises whether the lands of Mrs. Rogers were taken for a *public use.*

It is not denied that an almshouse establishment in the neighborhood of a large city is not only eminently beneficial, but indispensable. In this case the lands were not taken for the purpose of building an almshouse. The establishment already existed; and the wants of a rapidly growing city required that it should be enlarged. It became then not only convenient, but

absolutely necessary, to take these particular lands. No others would have answered the purpose, unless the establishment had been removed.

But it is said that the act of March 29, 1816, the provisions of which are adopted in the act under which the property in question was taken, contains a recital that a memorial had been presented to the legislature, in which it was stated that the defendants were desirous to become possessed of certain lands therein described, for the purpose of erecting thereon a public market, and with the right of converting and disposing of the lands for *other public purposes* or *otherwise,* whenever they or their successors might deem the continuance of the market there unnecessary; and it is contended that this recital shows that the defendants intended to take the property in question for other than a public use. It will be remarked that no such recital is contained in the act of 1818, and that the previous act is referred to merely for the purpose of pointing out the manner in which the title to the property should be transferred to the defendants. But, even if both acts had contained the same recital, and if the state had transcended its legitimate power, we think that under the circumstances of this case, the plaintiffs would be without remedy on that ground; for it is an admitted fact that the testator of the plaintiffs received the sum awarded by the commissioners as the value of the property, and it does not appear that she ever objected to the validity of the law, either on constitutional or other grounds.

It is said, however, that she acted under compulsion. But such is not the fact. The proceedings by which the defendants obtained possession of the property were compulsory, but her acceptance of the sum awarded to her was voluntary. If the act was void she could have refused to receive the money, and she would at once have been entitled to recover the possession of the property which had been illegally taken from her. By her acceptance of the money she acquiesced in the validity of the law. (*Clay* v. *Smith,* 3 *Peters,* 411. *Lee* v. *Tillotson,* 24 *Wend.* 337. *The People* v. *Murray,* 5 *Hill,* 468.)

The next ground on which the plaintiffs claim relief is that

the public use for which the land was taken, being abandoned, the right to it, or its proceeds, belongs to the plaintiffs, as the representatives of Mrs. Rogers ; or in other words, that the defendants took it subject to a condition that when it should cease to be occupied for a public use it should revert to the original owner.

It is not pretended that any such condition is expressed in the act under which the land was taken. On the contrary, the act declares that when the value of the land, as assessed by the commissioners, shall be paid by the defendants, they shall become and be seised in fee simple absolute. The legislature, in the exercise of the right of eminent domain, possessed the power to give a complete and unconditional title. They deemed it necessary to do so, and they were the judges of the necessity. (*See* 2 *Kent*, 340.) The sum which the defendants were bound to pay, and which they did pay, and which Mrs. Rogers accepted, was the full value of the fee. And it is not obvious upon what principle of equity a condition should be implied, the effect of which would be to divest a right thus acquired. There has been no hardship in the case ; for a full equivalent was received by Mrs. Rogers. It is true that subsequent events have proved that if she had retained the property, until the time when it was sold by the defendants, it might have been for her advantage ; but this does not show, nor does it tend to show, that she did not receive a full consideration at the time the land was taken. It is not pretended that the price which was paid was below the then standard value ; and because years of almost unimagined prosperity have caused an increase of wealth and population, and a corresponding rise in the value of real estate in the city, can it be seriously argued that the commissioners in making their estimate acted in error, or under a mistake ? The estimated value of all unimproved property contiguous to the city is founded, to a great extent, upon anticipation. And it has never been supposed at any particular time, that the expectations of the public in reference to the future, were not sufficiently sanguine ; although subsequent experience may have shown that such was the fact.

Heyward v. The Mayor, &c. of New-York.

But it is said that in this case there was misrepresentation in the application for the law under which the land was taken. There is no proof of any such misrepresentation. The defendants stated that they wanted the property for purposes connected with the almshouse establishment. It is not denied that such necessity then existed, and it appears that it continued to exist for many years afterwards. It is said, however, that the subsequent acts of the defendants show that there was intended deception. But can it be gravely urged that a corporation whose representatives, and whose policy and principles are constantly changing, invoked the aid of the legislature to obtain possession of a piece of property, the use of which was then necessary for the public good, with the intention of practising a fraud upon a highly respectable and unoffending citizen, which could only be consummated at the end of a quarter of a century?

Again, it is contended, and somewhat inconsistently with the other views which have been taken by the plaintiffs, that here a state of facts has occurred which could not be fairly contemplated nor provided for, and which is contrary to the basis upon which the land was taken, and that a court of equity ought to interfere to prevent injustice. Upon this point the case of *Quick* v. *Stuyvesant*, (2 *Paige*, 84,) was cited upon the argument. But what are those facts which were not contemplated by the parties? In the first place the limits of the city have extended with a rapidity which had not been foreseen. And secondly, the defendants made a purchase of an island peculiarly adapted to the accommodation of the public establishments of the city. It was owing to the concurrence of both of these circumstances that the change of location of the almshouse establishment was made. It will be remembered that this event which created the *ex post facto* equity upon which the plaintiffs rely, did not occur until twenty-six years after Mrs. Rogers became divested of her property—that it is an event of which she never knew—and which it was reserved for her grandchildren to witness. It is sufficient to say that courts of equity have never gone to such a length.

But it is said that this case is analogous to that of a turnpike

road, and that when a turnpike road has ceased to be used as such, the land reverts to the former owner. In the case of *Hooker* v. *Utica and Minden Turnpike Road Co.* (12 *Wend.* 371,) it is intimated that such is the law of this state. But there is a wide distinction between the two cases. A turnpike road is a highway in which the public have a qualified easement; that is, the right to pass and repass upon the payment of a certain toll established by law. A turnpike company, as a condition of its existence, is bound by law to make a road of particular dimensions. It is bound to continue the road for the public use, and when it ceases to do so it ceases to be a corporation. While it continues to be a company, it has the fee in the soil of the road; but when it ceases to be a company, the title must *ex necessitate* vest in some one else. And it would seem reasonable that it should revert to the original owner. In the case before us, however, the title to the land in question became vested in the defendants as a municipal corporation of varied and extensive powers and duties; a corporation bound to provide suitable accommodations for a class of inhabitants which will always exist in spite of the wisest police regulations. If one location is given up, it must be merely for the purpose of obtaining another more convenient. And if the corporation has obtained property through the instrumentality of the state, in a proper case, in good faith, there can be no good reason why a new location should not be paid for by the sale of that which has been abandoned. The paramount interest of the public requires it; and the party whose property has been taken shares in the benefit equally with others.

The bill of complaint must be dismissed with costs.