By the Court. Hoffman, J.
There are four propositions under which all the material facts and questions of law arising in this case may be distributed. Upon three of these all the members of the court concur in the views I am about to state. Upon the fourth proposition, I express my own opinion merely.
First. That the present plaintiffs cannot sustain the action for recovery of the whole strip demanded, even supposing that George Lorrillard had any estate or interest in it.
Second. That the present plaintiffs cannot sustain the action for the proportion which they would be entitled to, in right of Mrs. Bar-tow as a co-heir of George Lorrillard. That proportion is one-tenth.
Third. That all the heirs of Lorrillard could not unitedly sustain such an action.
Fourth. That no one could sustain a similar action, because the proceedings to close Cross street were legal, and have vested a good title in the defendant.
First. The action is brought to recover a certain strip of land formerly part of Cross street, and described as follows:—All that parcel of ground situate in the 6th ward of the city of Eew York, heretofore a part or portion of the street called Cross street, and bounded and containing as follows: Beginning at a point on the northerly side of Chambers street, distant, north-westwardly, 30 feet from the corner of Centre and Chambers streets, and runs *133 thence north-easterly along the easterly line of Cross street, "being also the line of land belonging to the estate of George Lorrillard, 37 feet 5 inches, to a corner of land belonging to the said estate of George Lorrillard, and land of George Bruce; thence north-westwardly, as the line between the lands of the estate of George Lorrillard and the land of George Bruce would run, if extended 20 feet 9 inches to the centre of Cross street, thence south-westerly 43 feet 2 inches, to the line or side of Chambers street aforesaid, and thence along the same, 20 feet to the place of beginning.
The description in the complaint is more condensed. This is taken from the deed of the Manhattan Company hereafter mentioned.
George Lorillard derived title on the 1st of June, 1808, by a conveyance from John Murphy, to a parcel of ground thus described : “ All that certain lot, piece, or parcel of ground situate and fronting to Augustus street, in the sixth ward of the city of Hew York, bounded easterly in front on Augustus street, westerly, by a certain street called Cross street, northerly, by a lot of ground formerly in the possession of John Wade, and southerly, by a lot of land formerly in the possession of John Strieker, containing in breadth, in front and rear, each twenty-five feet, and in length, on each side, about one hundred and six feet, more or less; (all such part of the said lot, when Chambers street shall be opened and extended to Augustus street aforesaid, as will be necessary to form a {continued) parallel line with the northerly side of Chambers street, only excepted.) And also, all the right, title and interest of the said John Murphy, in, and to such part of the' said lot of land, formerly in the possession of the said John Strieker, as shall on the opening and extending of Chambers street aforesaid, be and remain on the northerly side of the above {continued) parallel line.”
Before Hovember, 1832, George Lorrillard died. His will was contested, and finally set aside. His heirs-at-law succeeded to his estate. The final decision was in December, 1835. Some time prior to the death of Lorrillard, Augustus street was widened, and Chambers street extended eastwardly to Augustus street. And this last street was afterwards called City Hall Place.
The diagrams which I have drawn from the proofs and exhibits show the situation of the property at different periods from Lor *134 rillard’s purchase to his death. Ho. 1, shows the lot at the time of the purchase. Ho. 2, exhibits it as affected by the extension of Chambers street, and the widening of Augustus street. In this the .parcels are marked C C, which were taken for widening Augustus street; and the parcels A and B, are those made by the continuation of Chambers street. Parcel A, is the strip reserved in the deed from Murphy. Parcel B is that to which the right and title of Murphy is conveyed, referring to it as part of the lot formerly in possession of John Strieker. Ho. 3, shows .the lot as it existed on the 8th of March, 1836.
In this position, and on the 8th of March, 1836, a bill was filed for a partition of the real estate of George Lorrillard among his heirs. A large estate was sought to be divided, and among the parcels set forth in the bill of complaint, was a lot of ground described as follows. “ All those three tenements and lots of land lying on the northerly side of Chambers street, in the city of Hew York, and extending from Cross street to City Hall Place, being known and distinguished as Hos. 19, 21, and 23, Chambers street, and taken together, are bounded as follows, to wit: south-westerly, in front, by Chambers street; north-easterly, in the rear, by a lot of ground belonging to George Bruce; north-westerly, by Cross street; and south-easterly, by City Hall Place, formerly Augustus street, containing in front, on Chambers street eighty-nine feet eleven inches, (89 ft. 11 in.;) in the rear, upon ground of said Bruce, one hundred and one feet two inches, (101 ft. 2 in.;) upon the City Hall Place, nine feet two inches, (9 ft. 2 in.;) and upon Cross street, thirty-seven feet five inches, (37 ft. 5 in.) more or less.
Pending the suit in partition, and before the 6th of December, 1838, proceedings which had been taken by the Common Council for the opening of Centre street and closing of Cross street, were consummated. These proceedings had been commenced by the usual petition to the Supreme Court, in June, 1835. The commissioners’ report and supplemental report were presented to that court for confirmation, in January, 1837, and were, by rule, duly confirmed on the 4th of that month.
The effect of these proceedings, upon the parcel of ground in question, was, to reduce the line on Chambers street from 89 feet * 11 inches to 30 feet, and to make the front on Centre street 28 feet *135 4 inches. The closing of Cross street deprived the owners of a front upon-it.
Diagram Mo. 4 shows how the lot then stood.
On the 6th of December, 1838, a Master in Chancery made his . report in the partition suit, in which he stated the above changes made since the bill was filed; that the effect had been to take off the whole of Mo. 19 (street number) Chambers street, and most of Mo. 21. The residue of Mo. 21 had been added to Mo. 23, and formed one lot, as shown upon a diagram annexed to the report. The diagram is exactly Mo. 4; the words, in red ink, “ now owned by the Manhattan Company,” being found upon it.
On the 5th of February, 1839, an order confirming the commissioners’ report was made, and on the 26th of June, 1839, the commissioners appointed to make partition reported, and their report was confirmed on the 10th of July.
It should here be observed, that on the 23d of January, 1838, the Corporation of Mew York, having first offered the strip of land in question to the heirs of Lorillard, sold and conveyed it to the Manhattan Company; received payment of the price, and in their conveyance, bounded and described the parcel precisely in the same manner as the strip demanded in this action is described.
It should also be noticed, that the Manhattan Company had, for many years previous been the owners of the land fronting on the west side of Cross street, from Chambers street to Reade street.
And then, as before observed, the commissioners in partition made their report, confirmed in February, 1839, and therein allotted to Robert Bartow and Maria L. Bartow, in right of said Maria, a parcel of ground thus described: “ All that lot, &o., at the north-west corner of Chambers street and Centre street (being all that remains of the three parcels of ground described in the bill in this case as Mumbers 19, 21, and 23, Chambers street) and is bounded south-westerly, in front, on Chambers street; northeasterly, in the rear, by a lot of ground belonging to George Bruce; north-westerly by ground belonging to the Manhattan Company, (formerly part of Cross street,) and south-easterly by Centre street; containing in front, on Chambers street, 30 feet; in the rear, upon ground of George Bruce, 33 feet 2 inches; on the north-westerly side, 37 feet 5 inches; and on Centre street, 28 *136 feet 4 inches, be the same more or less; being part of the parcel of ground granted and released to George Lorrillard by John Murphy, by deed dated June 1st, 1808, recorded in liber 80, p. 288.”
It is admitted that no allotment made by the commissioners in partition to any of the heirs of Lorrillard, will include the strip in question, unless it passes by the allotment to the plaintiffs.
In our opinion it is perfectly clear that it did not pass to them, and that if the heirs collectively ever had or could claim a right to it, it remains a part of the undivided estate of their ancestor.
It is manifest that it was never carried into or estimated as a part of the estate to be apportioned. It was valued, in 1837, at over $7,000.
Every term of the description in the allotment to the plaintiffs is fulfilled and met, by excluding this parcel. The corner of Centre and Chambers streets is taken as a definite point. The length on Chambers street is precisely fixed at thirty feet. The plaintiffs themselves prove that in January, 1838, the Manhattan Company took possession of the strip, claiming to have purchased the same of the Corporation of New York, and the diagram to the Master’s report, designating the lot to be set off as part of the estate, speaks of this strip, “as now owned by the Manhattan Company.” To give the parcel in question to these plaintiffs separately, under this allotment, would be to adopt a very forced construction of words, and when that construction would work injustice to others.
We are all clear in the conclusion that the plaintiffs cannot sustain this action for the whole of the parcel demanded.
Second. The present plaintiffs cannot sustain the action for the proportion, viz.: one-tenth which Mrs. Bartow would take as a co-heir of George Lorrillard, assuming that he was vested with any right in, or title to, the strip.
The decision of the Court of Appeals in Embury v. Conner, (3 Comstock R. 511,) determined, that the 179th section of the general act relating to the city of New York, (2 R. L. 1813, p. 416,) authorizing the taking of fractional portions of lots, which were not within the limits avowedly taken for public use, was unconstitutional, unless it was done with the owner’s consent; that the act could be construed so as to provide for the taking with such *137 consent; and then its provisions would be lawful. That consent could be proven like any other fact. The statute of frauds, as affecting real estate, without writing, did not apply, if a parol consent could be proven.
As to what amounts to such a consent, the court approved the decision in Baker v. Brannan, (6 Hill, 47.) There an action brought by a party for damages assessed upon laying out a private road under a statute, was held sufficient proof of assent. The statute was to be read, with the proviso that the owner should consent. The action was proof of it, and assumpsit would lie by him against the party assessed.
Again. Justice Jewett adverts to the statement in the report of the commissioners, that they had awarded a certain sum to the devisees of Daniel Ayman, in consequence of their relinquishing their interest in the parcel of ground taken, and says that the statements in the proceedings and report were admissible in evidence, to show that the parties to the suit were parties, by actual appearance, to the proceedings.
The court consider Embury bound, by his appearance and acts, and observe that if it was shown, that he was authorized to represent the others before the commissioners, it would show their consent also, especially when connected with the fact that they received the compensation awarded. The learned Judge then adverts to the fact of Margaret Jacot being a married woman, and expressly holds that her consent could have been given and proven in the same manner as that of adults. But there was not sufficient proof of her consent.
We, in the first place, consider the present case as if Mrs. Bar-tow had not bound herself, or could not bind herself, by what has taken place. But the action is by the husband and wife. The husband is entitled to the whole rents and profits of this property, if recovered, during their joint lives, if there are no children, and during his life, if there are. Ho separate judgment can be given in favor of his wife and against himself. They must recover jointly, or not at all. What defeats him defeats the action; and what amounts to a consent to, or ratification by him, of these proceedings, is fatal to the recovery.
As to him, the case is stronger than that of Embury & Conner.
He united in the power of attorney to Mr. Dean, set forth in the *138 case. The fifth article of that power, empowers Dean to do all necessary acts, for the preservation of the estate and the promotion of its interests, after confirmation of assessments, in cases of opening and widening streets. It is proved, that Dean acted as general agent of the heirs, and had the charge and supervision of the estate; that he appeared, as such agent, before the commissioners; that among the papers returned to the Supreme Court, was a communication, in writing, made by Dean as such agent, asking for the correction of the report, as to an award of damages on a lot in Centre street; which correction was made.
On the 16th of June, 1837, Dean, as agent of the heirs, applies to the Common Council, praying that such part of Cross street as adjoined their property may be conveyed to them, in fee, upon their paying their just proportion of the estimated value of that part of the said street, so to be closed.
On the 9th of September, 1857, he joins, as such agent, in a remonstrance against the employment of the strip in the closed street for a public school; and praying, that the corporation would sell the same to the adjoining owners, and on such terms as would be equitable.
On the 11th of December, 1837, Dean, as such agent, united with other owners of adjoining lots in remonstrating against the corporation putting an enhanced price upon the property; but praying that the ground should be awarded to such owners, at the commissioners’ valuation, with the addition only of such percentage as would save the public from loss. The Common Council having decided against this application, and the estate ofLorrillard refusing to take the parcel at the proportion stated of the enhanced price, the sale and conveyance were made to the Manhattan Company.
On the 1st of July, 1837, the said Dean, as agent of the estate, received from the corporation the sum of $19,438, the amount of the awards to the estate for damages, and paid them the sum of $21,616.66, the assessments for benefits.
In October, 1837, he submits a statement to the heirs, of these facts. Both amounts go into his general account with other items, and he divides the balance among the heirs, according to their respective proportions, and accounted for and paid over the same to them.
To estimate the force of this statement and receipt, it must be ■ *139 remembered, that the closing of Cross street was united with the opening of Centre street, and made one proceeding. Hence, the award for damages includes all which the estate sustained, by each and all of the operations. “ It must be assumed,” in the language of the report of the Board of Assistants, “ that all persons who were shut off from the old street, by the improvement, have been allowed the full amount of the damage they have received.” Clearly, if there was a damage to the adjoining lot, by losing the side-front on Cross street, the commissioners did, or ought to have allowed it. Clearly, it could have been corrected, if they had erred in this particular, on the motion for confirmation.
Thus, then, the statement and receipt of the dividends amounts to this: that the agent had obtained, for damage in closing Cross street, (together with some sums for other damage,) a certain amount of money, and they accept it. Or, if nothing was allowed, he apprises the heirs of this fact, and pays them what was awarded on the other, but connected account.
It must be, here, also noticed, that, at the time, only the damages for the parcel actually taken for an improvement were specified in a report. An incidental damage, such as the loss of the side-front, would not appear, even if allowed for by the commissioners. The act of April, 1839, (ch. 209, § 3,) corrected this mode of making up a report. The commissioners may well have balanced the loss of a front on Cross and Augustus streets, by the far more valuable front on Centre street.
In our opinion, the consent of Robert Bartow, and his ratification of these proceedings, is placed beyond a doubt, upon the principles of the case in the Court of Appeals.
In relation to Mrs. Bartow, whether she was bound by the acts and evidence, which we consider as binding upon her, husband, we express no opinion. It is unnecessary for the decision of the cause.
Third. The third proposition is, that all the heirs of George Lorrillard, could not, collectively, sustain such an action, to recover the premises.
This position, the defendant’s counsel has strenuously urged, and upon reasoning substantially this—that, in order to dispossess a defendant, who, or whose grantors, have been in possession for fifteen years, a prior actual possession must be made out, or a clear *140 paramount title. The former, of course, cannot be claimed. It never, at any time, existed in George Lorrillard. If it had existed, the right ought to have been asserted in a reasonable time. (Whitney v. Wright, 15 Wendell, 171.)
What superior title could the heirs of Lorrillard show in themselves? Cross street, it is stated in the case, was an open and public street of the city as early as the year 1800. All that the record shows of the derivation of Lorrillard’s title to the adjacent lot is the deed, from Murphy to them, of 1808. In that the boundary is, “Westerly by a certain street, now called Cross street,” the length there being twenty-five feet. And then Murphy also grants all his right and title to the strip formerly in the possession of Striker, and which I have marked on diagram B. This triangular piece gives the twelve feet five inches on Cross street. And this, with the original twenty-five feet, is stated in the bill for partition as having belonged to, and been in the possession of Lorrillard.
We may concede, for the present, that the presumption acted upon in the cases of John street and Cherry street, (19 Wendell, 659,) of the occupant, and apparent owner, of an adjoining lot being the owner of the strip, is a valid presumption. But that will be proper, simply to determine to whom the money awarded for damage, or assessed for benefit, should be adjudged. It can settle no rights between the true owner, when discovered, and the occupant. The court would not enter into the adjudication of such contested claims.
But when an ejectment is brought by a claimant against a party in possession, something more is necessary than to show a mere right which amounts, at the best, to a presumptive right of possession. When no actual possession ever existed in the claimant, and none is shown in his grantor at the date of his grant, he must go back, and show that some one, under whom he claims, had, at one time, possession and title, or at least the latter, and that he has succeeded absolutely to all such right.
These views strike us as entitled to great weight. It might, however, be improper to determine upon them, absolutely, in the absence of other heirs of Mrs. Lorrillard.
Fourth. I proceed to the consideration of the fourth point stated, as to which I express my own opinion only. In my judgment, *141 neither the plaintiffs, nor the heirs of Lorrillard, nor any other person, can make out a better title to the strip in question than the defendant. That title is legal and valid. The proceedings of the corporation, and the deed to the Manhattan Company, were authorized and lawful.
I consider that in relation to the ancient public streets of the city of New York, it is either matter of fact, or matter of legal presumption, that the fee is in the corporation. By the term ancient, I mean all the streets not laid out under the act of 1807; and by the term public, those originally laid out by the city government, under an existing law, or where laid out by private owners, adopted and taken by the corporation as public streets.
And here it is to be noticed, that, without the act or adoption of the city government, there could not be a public street. In the language of Mr. Justice Platt, (19 Johnson Rep. 186,) “ The original survey and map showed that Peter Stuyvesant formed a plan for laying out streets over his land in 1796. But we must intend that every person knew that those streets could not be established as public streets of the city, unless they were sanctioned by the corporation, or other public agents, having such powers.”
This necessarily resulted from the grant in the charter of 1686, confirmed in that of 1730, of the right and absolute power to ordain and establish streets throughout the city. An absolute power like this was, necessarily, an exclusive power. Justice Platt is mistaken, if indeed, his language is so to be understood, in supposing that the statute of 1807, superseded, as an act of legislative power, the control of the corporation. That act was passed upon the formal application and assent of the city government.
This act of 1807 was a compact with the legislature, by which the corporation of New York agreed to a circumscription of its own powers, and in establishing a great system of streets, to restrict itself from the exercise of the power of alteration. But beyond the limits of the act, every power remained as absolute as it was before.
In relation to Cross street, we find it upon the record, that in or prior to the year 1800, it was one of the known public streets of the city of New York. I do not suppose that a reference to the public maps is improper. ITpon examining them, we find that in that of 1755 there is no trace of it, nor in that of Lieutenant Rutzell, *142 of 1767. In Hill’s map, of 1782, we find a line drawn, apparently corresponding with the easterly line of this street, and houses marked upon it. But no line of a street is indicated on the westerly side. In the map of 1797, it is laid down with the marks of a street, and called Potter’s Hill. It is defined from Chambers street up to Read on the westerly, and to Bailey street on the easterly side, the latter being a continuation of Read street, with some divergence. On the map of 1808, it is similarly laid down, but not named.
It is an inevitable conclusion, that Cross street, being a public street in 1800, had been taken and opened as such, in one of three modes. Either under the act of April, 1787, then in force, by a regular adversary judicial proceeding; or, under the same act, by mutual agreement as to the price, or compensation to be allowed; or by formal written cessions.
Under the statute, where the only question was as to the compensation, it was (as may naturally be inferred) the course to appoint arbitrators to adjust it. The cessions appeared to have been employed, where a transfer of the right was agreed tobe made for certain collateral advantages, or stipulations, not the direct payment of a sum of money.
In either of these supposable cases, by which Cross street could have been opened, and made a public street prior to 1800, T apprehend the fee would pass. As it is not in evidence how it was in fact opened, we have only to act upon the statement of the record. But we have here the aid of. a rule of law, that when the mode of opening, a street cannot be traced, the legal presumption is, it was opened according to the law then in force. (2 John. Rep. 424; 2 Southard, 482.)
There are some propositions tending to interpret the act of 1784, which should in the first place be considered.
If the title to the land in this street was derived from , a Dutch ground brief, it was originally subject to the right of the Government to take it without any compensation. And then the Colonial act of October, 1691, of which that of 1784 was a transcript, and the latter act, were restrictions of an unlimited power of government ; and upon settled rules of law, the acts are to be construed strictly, as affecting pre-existing rights. What is not *143 plainly taken away from the corporation, by necessary inference remains in them.
I forbear to proceed farther upon this topic. I have adverted to it, because, should it turn out, if this case goes again to trial, that the title to the land rests upon a Dutch ground brief, the point, to my mind, will be of no little moment.
Again, it is not to be contested that, for the purposes of the regulation of a city, it is highly expedient, if not essential, that a fee should reside in its government.. (City of Cincinnati v. White's Lessees, 6 Peters, 133; Board of Trustees v. Havens, 11 Illinois, 534; Hunter v. Middleton, 13 Illinois, 50; Doe v. Jones, 11 Alabama, 63; Ch. Justice Jones in Drake v. The Hudson River Railroad Co., 7 Barbour, 536; Williams v. The New York Central R. R., 18 Barbour, 246; Chapman v. The Albany and Sch. R. R., 10 Barbour, 363.)
In the next place, the rule applicable to country highways may well be placed upon the consideration, that the fee in the soil avowedly did not pass to the public. It was not estimated and paid for, but merely a right of use and enjoyment, and it was not paid for, because it was unnecessary for any of the public purposes that the fee should be taken.
As if pointedly to mark the distinction between public highways, and streets in the city, the Colonial Assembly, on the 6th of May, 1691, passed a general highway act, and on the 1st of October, 1691, passed the particular law applicable to streets in the city of ¡New York.
This act of the 6th of May, provided for the laying out of such highways as should be agreed upon by a majority of the freeholders of the towns, subject to the approval of the Court of Sessions. (1 Smith and Livingston.) ¡No provision was made for the compulsory laying out of a highway.
In June, 1703, another act was passed, which appears to have been a general act. It was- continued on the 4th of August, 1705, and expired at the session after the 17th of June, 1709. The act of 1691, (May 6,) appears to have been revised. We find it in Van Schaack’s edition of the laws, 1773.
By the act of 1703, commissioners were appointed for the several counties of the state. Under it the old post road was laid out, *144 from the city of Hew York to the colony of Connecticut. There was no provision in it for compensation to owners.
There were some special acts during the colonial legislature of a very peculiar character. Thus, a statute was passed the 14th of October, 1732, for highways and roads in Suffolk county. The full value of the land, and damages by reason of making the road, were to be paid, and the persons desiring such road were to pay such value, damages and expenses. The road was then to be held for the only proper use of such persons as should pay for the said road, their heirs and assigns.
On the 29th of Hovember, 1745, an act was passed relative to highways in Westchester county. In this, if the road was Sum through improved lands, compensation was to be made to the owner. If an agreement was not made, a mode for settling the amount by a jury, was prescribed.
On the 4th of May, 1784, the first act of the state was passed. It extended to Dutchess, Orange, Albany, Ulster, Washington, Westchester and Montgomery. Suffolk and Richmond were afterwards added. It had this new feature, that if the road was laid out, through improved or inclosed land, compensation was to be allowed for the value of the land, as well as damages to be fixed by two justices, or twelve men. Ho highway could be run through an orchard, or a garden, without consent.
This was revised, and a new act passed in April, 1801. (Sess. Laws, ch. 186.) This applied to all the counties except Hew York, Kings, Queens, Suffolk and Richmond. The 15th section directed that where the road was run through improved or inclosed lands, compensation was to be made through a jury for the damages sustained by the owners, by feason thereof.
In the revision of 1813, the provisions are similar as well as in the Revised Statutes of 1830. (1 R. S. 628, &c.)
There was a special statute passed April 2,1801, (Sess. Laws, p. 111,) which deserves particular notice. It related to highways in the counties of Kings, Queens, Suffolk, and Richmond, and it provided that the commissioners should not lay out any road through any person’s land without paying him the true value of the land so laid out into a highway or road, with such damages as he shah sustain thereby. This was the same provision as' was inserted in several colonial statutes before noticed.
*145 But in the act of 1830, this language was omitted, and the general clause employed, damages caused by the laying out of such highway. (1 R. S. 515, §§ 64, 65.)
From this review of the highway acts, it will appear, that, with the remarkable exception of the counties mentioned in particular statutes referred to, compensation was not allowed at. all for public highways, until the act of 1784; and in that act only, when the land was improved; a provision changed in the statute of 1830. When land was not allowed for, or when only the damages were allowed, caused by the laying out, there could be no ground for supposing a transfer of the fee. It was not necessary. It was not paid for. It was not therefore actually, or impliedly, taken.
In the late case of Gola v. Glass, (19 Barb. Rep. 189,) it was held, in the fourth district, that the clause in the General Highway act, authorizing wild lands to be taken in effect without compensation, was unconstitutional under the constitution of 1821. The road was laid out in 1840. The provision referred to is:— “ That private property shall not be taken for public use, without just compensation.” "
A similar decision was made in the seventh district, in the case of Wallace v. Karlenowski, (Barb. 118.) Justice Welles, in delivering the opinion of the court, adverts to the uniform character of such highway acts from the year 1784, and does not question their legality before the constitution of 1821. He observes also, that there can be no substantial distinction, because the right of way only was taken, and not the fee. The owner was deprived of his land, at least, for a time.
It can scarcely be doubted, that the received colonial law, recognized a right in the state, if not in the crown, to lay out public highways over lands without compensation. The statutes creating special exceptions, tend to prove this general law. From what source this rule was derived, is not so clear. The most sensible and consistent supposition appears to me to be, that it was the influence of the Dutch law, the same as the general civil law, by which the tenure of lands was such as rendered them liable to this public servitude. I have elsewhere endeavored to show from public documents, how extensively the Dutch ground brieves were regarded as sources of title, protected by the capitulation, and to which this public right attached. (Law of the Corpora *146 tion, p. 265, 268,) all these statutes, then, were restrictions of the state, imposed" by itself upon the exercise of its public right.
Nor is there any thing in the rules of the common few to shake this conclusion. The great highways of England were termed the king’s highways, alto regia via. They ran through lands belonging to the king, as the source of title or original owner, upon the doctrine of feudalism; or through lands granted by him. The highway was then run through such lands by an act of the king’s power, or by the voluntary act of the owners. In either case, there was no compensation. And in either case, the king could not reclaim the land when the highway was discontinued.
When the act of 1691, and its copy, that of 1787, are examined by the light of these principles and this history, it seems to me a just conclusion, that the fee was to be paid for, and did pass. It enacts, that if, in laying out any street, the corporation take any person’s ground, they are to give notice to the owner. To the intent that satisfaction may be given for all such ground as shall be taken and employed for the uses aforesaid, the mayor, &c., are empowered to treat and agree with the owners. If no agreement was made, they were to summon a jury before the court of the mayor, aldermen, &c., to inquire and assess such damage and recompense as should be due to the owners and others interested, for their several losses, according to their several and respective interests and estates in any such ground, or any part thereof, for their respective interests and estates in the same, as shall be adjudged'fit to be converted for the purposes aforesaid. And upon the verdict of the jury, and payment to the owner and others having estates and interests, or tender of the amount, the judgment shall be binding upon, and against the parties, their heirs, executors, and assigns, and others claiming any estate or interest of, in, and to the said ground, and shall be a full authority to the said mayor, &c., to cause the said ground to be converted and used for the purposes aforesaid.
The value of the ground, according to the estate and interest of the parties therein, is to be estimated and allowed. Beyond all question, an estate in fee would be valued as such, and paid for. What would be the judgment under the act? That the ground be adjudged to the mayor, aldermen, &c., to be held by *147 them and their successors, for the use and purpose of a public street, upon payment or tender of the amount assessed.
When, then, in the act of 1813, that distinguished lawyer, Chief Justice Jones, who drew it, inserted the provision, that upon confirmation of the report, the corporation should become seized in fee of the lands taken for opening the street; in trust, to keep the same open as a public street,” he did no more than embody the traditionary and received doctrine of the colony and the state. He was the historian rather than the author of the law.
A few authorities may be here noticed.
In The Board of Trustees v. Cavens, (11 Illinois Rep. 554,) a statute provided that a proprietor of lands in a city about to lay them out in city lots, should make a plot in which the lots, streets, and alleys should be designated, “ and the land intended to be for streets, or other public uses in any town or city, shall be held in the corporate name thereof, in trust, for the uses and purposes set forth and expressed or intended.”
Under this act, the legal title to land in a street designated on such a plot was held to be in the corporation of a city, for the use of the public.
Hunter v. Middleton, (13 Illinois Rep. 50,) declared the same rule, and recognized the previous case. The court adverted, indeed, to the possibility that the fee might revert upon a discontinuance.
In Doe v. Jones, (11 Alabama Rep. 63,) it was held, that where - there was a dedication for a public purpose, a grantee was unnecessary. The rule that a fee could not be in abeyance, was inapplicable where it was contemplated in the act of dedication that one would arise.
The necessity for a larger extent of power as to streets than as to highways, is dwelt upon. The rule of the court in Barclay v. Howell, (6 Peters, 499,) is applied, that if a corporation appropriate property given to it to a use different from that declared, it was ground for the interference of a Court of Chancery, not of a reverter to the former owner.
In Barclay v. Howell, (6 Peters, 499,) the court say, if this ground'had been dedicated for a particular purpose, and the city authorities had appropriated it to an entirely different purpose, it . might afford ground for the interference of a Court of Chancery *148 to compel a specific execution of the trust, by restraining the corporation, or by the removal of obstructions. But even in such a case the property dedicated would not revert to the original owner. The use would still remain in the public, limited only by the conditions imposed in the grant.
Hayward v. The Mayor, &c., of New York, (8 Barb. 486; 3 Selden, Court of Appeals, 314,) involves, to some extent, the same principle: the memorial of the corporation is indeed recited, in which they pray, not only that they may be empowered to take the lands for a market, but also to hold them for other public purposes in case of a discontinuance: and the preamble to the statute is, that the prayer appears reasonable. The statute also vested the fee in the corporation, in terms, upon payment of the amount assessed.
The case was of grounds taken under the act, for an almshouse establishment. The corporation paid the full value of the land, and many years afterwards removed the buildings, &c., and sold the property. The action was to recover the proceeds of the sale. Mr. Justice Edwards, in delivering the opinion of the court below, said:—“ The title to the land in question became vested in the defendants, as a corporation of varied and extensive powers and duties. A corporation is bound to provide suitable accommodations for a class of inhabitants which will always exist in spite of the wisest regulations. If one location is given up, it must be merely for the purpose of obtaining another more convenient. And if the corporation has obtained property in a proper case in good faith, there can be no reason why a new location should not be paid for, by the sale of that which has been abandoned. The interest of the public requires it, and the party whose property has been taken shares in the benefit equally with others.”
Again, the principle of the street cases should be examined. If it were not for the doubt cast upon the point by expressions on the opinions in two cases in this court, we should unhesitatingly conclude that the deed of Murphy did not pass the fee to the half of the street.
From the very beginning of this series of cases, viz.: the Mercer street case, (4 Cowen, 423,) to this time, there has been an unwavering course of decisions in the Supreme Court, and the Court of Errors, holding that a grantor, who bounds his grant upon a *149 street in the city of New York, does not pass the fee to his grantee. And there is no distinction made between streets laid out under the statute of 1807, upon the commissioners’ map, as it is termed, and the streets laid out by the corporation, or adopted by the corporation as public streets, and not within the limits of their great plan. The Mercer street case, (4 Cowen, 423;) The Sixteenth street case, (1 Wendell, 262;) Lewis street case, (2 Wendell, 272;) Attorney and Ridge street case, (8 Wendell, 85;) Thirty-second street case, (19 Wendell, 138;) Twenty-ninth street case, (1 Hill, 189;) Fifth street, (11 Wendell, 486;) Furman street, (17 Wendell, 601,) all concur to establish this result. I cite, to explain as well as to establish the rule, the language of Chancellor Walworth in Livingston v. The Mayor, &c., (8 Wendell, 99.) “ The principles of construction applicable to grants of property in the country do not apply to conveyances of city lots. The right of way is a mere rural servitude, confined to a convenient passage from the property granted to a public road.” After stating the effect, in Ms opinion, of a grant of city lots bounding upon streets, he says, all that the grantor has a right to claim, is the value of the street to Mm, subject to the right of his grantee, to have them kept permanently open; in other words, the mere value of the legal title, subject to the easement of urban servitude.
These cases establish tMee points,—
First. That the owner of land in New York, making a grant in general terms, fronting a public street, did not pass the fee.
Second. That he must expressly grant to the middle of the street, in order to pass the fee to his grantee.
Third. That in either case, the fee was subject to an easement in the street. And here arose a most important distinction, applicable to tMee classes of cases. ■
If the grant was upon a street laid out upon the map of the commissioners of 1807, the fee remained in the grantor, until the street was opened. When opened, if he retained the property on one side, the value of the land, taken up to half the street, was given Mm, its actual value, as determined by the commissioners. If he had sold a fronting lot before the opening, bounding upon the street, he retained the fee; but it was of mere nominal value. The easement given by the boundary robbed it of any actual worth. The award of a dollar extinguished it. If he gave ex *150 pressly up to the centre of the street, it was a point not fully settled, whether the grantee might not require payment for the actual value. But in any event, the corporation acquired upon the opening, the whole fee in trust for the public.
Next That these principles were equally applicable to streets laid out by owners, and taken by the corporation for public use, in any mode in which they could legally take them.
Third. If so applicable in these cases, undoubtedly they were applicable when the corporation opened streets in parts of the city, not comprised within the limits of the map of 1807, under its general statutory power, and in pursuance of such power.
The cases in the Superior Court, to which I have adverted, are Hammond v. McLaughlin, (1 Sandf. R. Sup. C. 340,) and Herring v. Fisher, (ibid. 344.) In the latter, the Chief Justice expressly says: “We are not determining the construction of a conveyance of city lots, but of a country farm. The Herring farm, at the date of this conveyance was literally in the country, and Amity Lane was nothing more than a country road.” The court treated it as a public highway. But I have elsewhere shown that it never was adopted as a public street by the city. (Powers, &c., of the Corporation, p. 287.)
The other case was of a strip in a street called Catharine street, laid out by Mr. Hammond, and never adopted by the Corporation, but closed by virtue of the act of 1813, ch. 70. The Court say, no street ever was, in fact, laid out there, and no street could be laid out there as the law then stood.
These decisions are strictly compatible with the doctrine of the Supreme Court in the street cases.
I proceed to consider the act of 1818, under which the proceedings in this case were taken, with the cases of John street and Cherry street. (19 Wendell Rep. 660, et seq.)
The theory of this statute, I apprehend to be this: The corporation were, in contemplation of law, seized of the fee in the streets, but seized, in trust, to keep the same as public streets for public purposes. The trust was not a condition, upon breach of which the property would be divested, and a forfeiture be worked. Nicoll v. The New York and Erie R. R. Co., (2 Kernan, 131.) But legislative power and interference were necessary to extinguish the one public use, and apply the property, or its proceeds, to an *151 other. The statute, therefore, .provided a mode by which all the parties injured by the closing of the street, should have their damage and loss assessed; and it directed the corporation to pay such amount within four months, and then gave a right of action to the parties against the corporation, to recover the amount. In return for, and to provide means for meeting, this liability, the land was vested absolutely in the corporation, discharged of such trust, so that they could sell it in fee. The proceeds of the land were thus appropriated to a public purpose, viz.: to pay those to whom compensation was due for effecting that which public utility required, the closing of the street, or to other public uses.
With these observations, I proceed to examine the John street case, (19 Wendell R. 670.) I may first observe, that the decision was by Mr. Justice Cowen, at Special Term, and has not been judicially recognized since, in any case that I have ever met with. It has been practised upon, but in the manner hereafter noticed.
The improvement applied for in that case, was the closing a part of John street, on the southern corner of Broadway, which left a triangular piece to be taken; and also the taking a strip of land on the northerly side, straightening the street there, and altering the line elsewhere. The commissioners reported that the strip in question belonged to owners unknown, subject to a right of way, and they awarded to such owners one dollar for damages. They then assessed to the corporation, for the value of the strip to be taken to their use, $15,000. On the application for confirmation, Mr. Justice Oowen declared two points to be applicable.
ls<. That the owner of the adjoining land, Baltus Moore, was to be deemed the owner of the strip, and the one dollar should have been awarded to him.
Next. That the case fell within the constitutional provision of taking private property for public use without compensation. It was not to be treated as taken for public use.
But there is another most important fact connected with the John and Cherry street cases. The report was sent back for reconsideration and correction, by assigning and assessing the lands now awarded to the corporation, to the adjacent owners. (See 19 Wendell Rep. ,678, and rule of the Supreme Court made thereupon.)
The commissioners in the John street case, made their revised *152 report on the 24th of July, 1839, and reported, “That Baltus Moore was entitled to the strip, subject to a right of way in the public; and that they assessed the benefit and advantage to the said Baltus Moore, in consequence of his becoming entitled to the possession and use of such strip, discharged of the easement and public right of way, at $15,000.” This report was confirmed by the Supreme Court, September 9, 1839. The sum of $15,000 was the precise sum at which the land had been valued and assessed to the corporation.
I called the attention of the counsel to this fact upon the argument, having been one of the commissioners; and I have since examined the record in the street commissioner’s office.
The same was the course pursued, as I am informed, by the counsel of the corporation, in the Cherry street case.
The case, then, contains this judicial exposition of the statute. The mere nominal fee of the land in the street remained in the adjoining owner. It was valueless, subject to the easement. When such owner is to take or resume it, discharged of the easement, he must pay the actual value of the land, for the whole value consisted in the easement, which was to become extinguished. Thus in effect, he was to become the purchaser of the land; and having in fact, or by legal inference, received full value when the street was taken, he must pay full value when the street is restored, or given to him. This would be equity, and the remarks of the court in Hayward’s case (3 Selden, 326) become very pertinent.
The practice adopted by the corporation in these cases should be adverted to more fully to understand this subject. Sometimes it was to give the right to the adjoining owner to purchase the land at the price fixed by the commissioners.
In the present case there is a report of committees, and action of the corporation of a different character. In these it was assumed that the corporation had a right to sell to any one at an enhanced price. But the records of the Common Council show how much this point was contested. In one report of a committee, the right of the adjacent owner to a pre-emption was advocated, and at the commissioners’ price.
It was also conceded, that the offer to such owner at the enhanced price should be made.
The act of 1818, thus construed, is strikingly similar to an act *153 of 3d. Geo. cap. 126, (1822.) But the latter carries out the principles by express provisions. After the completion of a road under it, the old way, or so much of it as the commissioners deem to be useless, shall be discontinued as a public highway, (with certain exceptions,) and such old road shall be vested in the trustees, to be sold and conveyed by them for the best price. But they were to dispose of such old road to the persons whose land adjoined it, or if he should refuse to purchase, to some other person; and they might exchange with such person any part of the old road, for any land taken for the purposes of the act. The money upon a sale was to be applied to the purchase of the new road.
The result of the actual decision in the John street case was, that Baltus Moore, instead of having property taken from him, acquired property upon paying its full value. A barren, naked fee, worth nothing, was, by the letter of the proceedings, taken away; and an actual, absolute, and beneficial estate and possession was transferred to him. It seems a difficult problem to solve, how such an operation can be regarded as depriving a person of his property. If such a right of reversion was property, he ought not to have been bound to pay any thing; if not property, the act was not unconstitutional.
In applying the rule of this case to the present, we find that the commissioners valued the whole strip in Cross street, from Chambers to Reed, at $30,000. The valuation at which the corporation sold was $38,500, and the apportionment of that amount for the strip in question, was $7,526.50.
The proportion of $30,000 upon this basis would be about $5,767. Had the report been made upon the rule thus laid down, Lorrillard’s estate must have paid this sum. It does not seem possible to present a view of the case in which there could be any claim whatever, except a money demand for difference; a demand subject, of course, to many difficulties at this late day.
But, in my opinion, the case rests upon stronger grounds, and I state the summary of my views in the following propositions:—■
1st. Cross street, like other ancient public streets of the city, is to be assumed, until the contrary is proven, to have been opened according to the law existing at the time, which the record fixes before 1800.
2d. It is to be assumed that, upon opening such street, a full *154 valuable consideration was given for the whole interest of the parties in the land.
3d. On that assumption a fee passed to the corporation, but clothed with a trust to keep the same open as a public street for the public benefit.
4th. The act of. 1818, was constitutional, because it merely gave the assent of the legislature that, upon paying all who were injured, this trust should be extinguished, when the public benefit required it; and the property might be held and disposed of for public uses, or applied to the satisfaction of those to whom damages were awarded.
5th. The form of the report in this, and the John street case, of awarding the sum of one dollar to unknown owners as proprietors of the nominal fee, was irregular, but immaterial. It would have , been sufficient and legal to have reported that the corporation was assessed the particular sum of money, by reason of their taking the land in fee simple absolute, discharged of the basement.
On this, as well as on the other grounds which have been stated, the complaint must be dismissed, with costs.

*155