*Welles, J.
 

 There can be no it seems ^ ^ to me, but that the legislature intended, by the act under which the respondents claim to have acquired the lands, for the proceeds of the sales of which the appellants ask to have them render an account (Act of 21st April 1818, Laws 1818, c. 244, p. 255, &c.), that the entire estate of the owners of such lands should be
 
 *319
 
 - divested, and the whole interest and estate therein be vested in the respondents, upon all the provisions of the act having been complied with.
 

 The act, after reciting that the mayor, aldermen and commonalty of the city of New York were desirous of taking possession of certain lands, tenements and hereditaments, situate, lying and being in the ninth ward, &c., and bounded as follows, &c. (describing the lands, which include the premises in question),
 
 “
 
 for the purpose of extending the almshouse establishment of the said city,” enacted, that it should be lawful for the said mayor, aldermen and commonalty, whenever they should judge proper, to take possession of all or any part of said described lands, in the same manner prescribed in and by the act entitled “An act to vest certain lands in the mayor, aldermen and commonalty of the city of New York,” passed 29th March 1816; that all * 320 1 Prov^s^ons the said act should *have the -* like force and effect relative to the above-mentioned and described premises, and all persons interested therein, and also upon the said mayor, aldermen and commonalty, which they would have had relative to them, provided the above-mentioned and described premises had been particularly mentioned and described in the preamble of the said act; and that on the final confirmation of the report of the commissioners who might be appointed by the supreme court, in pursuance of the provisions of the said act, and the payment of the sums which might be awarded by them, the mayor, aldermen and commonalty of the city of New York should become and be seised in fee-simple absolute of said lands, &c., or so much thereof as might be mentioned and described in the said report.
 

 The preamble of the said act of 29th March 1816, recites that the mayor, aldermen and commonalty of the city of New York had, by their memorial, represented that they were desirous to become possessed of the lands, &c.,
 
 *320
 
 in the second ward, &c. (describing the lands particularly), for the purpose of erecting thereon an extensive and commodious public market, and with the right of converting and disposing of the said lands and premises for other public purposes, or otherwise, whenever they or their successors might deem the continuance of the said market there unnecessary; and that they were willing and desirous to defray the whole expense of the purchase of the said premises out of the city treasury, upon the said premises being vested in them in fee-simple, &c., and prayed the aid of the legislature in the premises; the said preamble then concludes as follows: “And whereas, the said prayer appears reasonable.” The act then provides for the appointment by the supreme court, or a justice thereof, of commissioners of estimate, whose duty it should be, after taking an oath faithfully to perform the trust and duties required of them by the said act, to make a just and true estimate of the loss and damage to the respective owners, &c., entitled unto or interested in said lands, &c., by and in consequence of relinquishing the same to the said mayor, aldermen and commonalty, and report thereon to the supreme court, who were authorized, either to confirm the same, or refer *it ^ back to the same or other commissioners to be appointed, for reconsideration, with the like power in relation to any subsequent report of commissioners; and the report, when confirmed by the supreme court, was to be final and conclusive upon all parties and persons whomsoever. The act then declares as follows: “ And on such final confirmation of such report by the said court, the mayor, aldermen and commonalty of the city of New York shall become and be seised in fee-simple absolute of all the said lands, tenements, hereditaments and premises in the said report mentioned, and thereupon the said mayor, aldermen and commonalty, or any person or persons acting under their authority, may, immediately, or at any time or times thereafter,
 
 *321
 
 take possession of the same, or any part or parts thereof, without any suit or proceeding at law for that purpose.” Provision is subsequently made in the act, for the payment by the mayor, aldermen and commonalty of the city, to the owners of the lands, of the sums estimated and reported in their favor by the commissioners.
 

 It will be perceived by the preamble of this act of 1816, that the city prayed of the legislature to aid it in purchasing the lands for the purpose of a market, such lands to be vested in the corporation, with the right of converting and disposing of them for other public purposes, or otherwise, whenever the continuance of the market there should be deemed unnecessary, upon payment of the whole expense of the purchase out of the city treasury; and that the legislature regarded the prayer as a reasonable one. The act then proceeds to grant such prayer, with an evident design to protect and secure the rights of all persons interested, and does, in terms, declare, that upon certain things being done, the corporation shall be seised in fee-simple absolute of the lands, providing, at the same time, for the payment to the respective owners of just sums for the loss or damage by and in consequence of relinquishing the lands to the corporation.
 

 The act provides for a compulsory sale of the premises, with a transfer- of the whole title thereto, from the owners thereof to *the mayor, aldermen and com- -* monalty of the city of New York, to be held by them in fee-simple absolute. Suppose, the act with its preamble to be turned into an agreement between the corporation of the city and the respective owners of the land, voluntarily and fairly entered into by all the parties, no one can doubt, but that the owners intended to part with their whole interest, title and estate, and that the corporation of the city expected and would be entitled to the absolute, unconditional and perpetual ownership of the lands, with all the incidents of absolute
 
 *322
 
 dominion, upon the terms and conditions of the contract being fully complied with. In both cases, that of a statute and of a contract, the primary and principal object to be sought after is the intention, in the one case, of the legislature, and in the other, of the parties, which intention is generally to be gathered from the language employed to manifest it, which, in both cases, as 1 suppose, is subject to substantially the same rules of interpretation.
 

 The statute of 1818, under which the proceedings of the corporation in this case were had, adopts and incorporates the act of 1816 referred to; and by it all the provisions of the last-mentioned act are to have the like force and effect, relative to the lands in question in this case, and all persons interested therein, and also upon the mayor, aldermen and commonalty, as they had upon the lands, persons, &c., mentioned and referred to in the act itself. The act of 1818, in this respect, is somewhat obscurely and inartificially drawn, but such, however, I am satisfied, was the intention and must be its effect. The two acts differ, as far as I can discover, only in one respect; by that of 1816, the lands were to vest in the corporation of the city, upon the confirmation by the supreme court of the report of the commissioners of estimate, and the owners were left to their action against the corporation to recover the estimates, in case payment was not made in one month; while by the act of 1818, the title vests only upon the final confirmation of the commissioners’ report,
 
 and the payment of the sums which might be awarded by them.
 
 As to the nature of the title to be acquired, the two acts are identical; and that title is what *both declare it should be, a
 
 fee-
 
 ^
 
 simple absolute
 
 (the highest and most perfect *- known to the law), provided adequate power resided in the legislature to create such a title in the manner contemplated.
 

 That the legislature possessed the power to direct the
 
 *323
 
 lands in question to be taken for the purposes mentioned, is not denied by the counsel for the appellants ; on the contrary, such power is-expressly conceded. But it is contended, that the power was limited to take the lands for the uses of the almshouse only, and that when they were no longer needed for that purpose, or such use should cease or be abandoned, the lands would revert to the original owner; and that the acts referred to, in so far as they assumed to confer, or authorize to be conferred, upon the corporation of the city of New York a title or power in respect to the lands, beyond such usufructuary interest, were unconstitutional and void; that while the legislature may, in the exercise of the right of eminent domain, take private property for the public use, it would be a perversion and abuse of the right, to allow it to be held longer than the use for which it had been taken should continue, or was necessary for the purposes for which it was taken.
 

 The question is not, as it was in
 
 Embury
 
 v.
 
 Connor
 
 (3 N. Y. 511), whether, when the property in dispute was -confessedly unnecessary for the purpose for which it was taken, although strictly within the act (2 R. L. 416, § 179), which authorized it, the legislature could vest the title in the corporation, without the consent of the owner. In that case, land had been taken in the city of New York, for the purpose of widening a street. The land necessary for that purpose did not include the premises in dispute, which was a part of a lot or parcel, the remainder of which was necessarily taken, and so appeared by the report of the commissioners of estimate and assessment. In such case, the act authorized the appropriation of that part of the lot which was not, with that which was, required for the street improvement. This court held, that the legislature could not confer the power upon the city to take the land in question, without the consent of the owners, as it was not required for the public use; and that the only construction of the
 
 *324
 
 179th ^section of the act, consistent with the „ ^ ^ constitutional power of the legislature, was to regard it as intended only to give the corporation
 
 capacity
 
 to take property under such circumstances,
 
 with the consent of the owner.
 

 It is settled by cases too numerous to need citation, that no power exists in the legislature, or elsewhere, to take private property, without the consent of the owner, for public uses, with or without compensation, except by due process of law; by which is meant, the judgment of the law pronounced upon trial, after the matter is judicially ascertained. A man can never have his property taken from him, without his consent, and given to another by mere legislation.
 

 The right to take private property for public purposes does not depend upon any express provision in the charter of government, but is an inherent attribute of sovereignty, existing in every independent state. Private interest must yield to public necessity; this is what is meant by the right of eminent domain. Its existence with us has never depended upon our written constitutions, although by those of 1821 and 1846, its exercise is declared to be limited upon the condition of making Just compensation. (Const, of 1821, art. vii., § 7; Const, of 1846, art. 1, § 6.) The constitution of 1777 contained no similar provision, and yet, I apprehend, no one from foundation of the government, ever doubted the existence of the right, from the silence of the constitution on the subject. The proceedings which we are now reviewing were all consummated prior to the constitution of 1821, and while we were without any express provision or organic law on the subject. Whether the right existed then, unconnected with the condition of making compensation, it is not material to inquire, because in the case at bar, compensation was provided for and has been made. Certain it is, that no honest legislature or Just government would be guilty of the moral piracy of failing to recognise and fulfil the duty of making just compensation, where private property should be taken for public use. (2 Kent’s Com. 339, 3d ed., note b.)
 

 With these general views of the right of eminent do- * 325 1 maan’ ^ **s ProPer to inquire, with a little more -* particularity and precision, into its character and extent. Does it imply the right in the sovereign power to determine the time and occasion, and as to what particular property, it may be exercised? Most clearly it does, from the very essence and nature of the
 
 right;
 
 to deny it would be to abrogate and destroy it. (2 Kent’s Com. 340, 3d ed.;
 
 Beekman
 
 v.
 
 Saratoga Railroad Co.,
 
 3 Paige 73;
 
 Varick
 
 v.
 
 Smith,
 
 5 Id. 159-60.) Shall the same power determine the estate or quantity of interest in the lands which shall be taken; whether an estate for years, for life or in fee; whether a right of reversion, in any event, shall be left in the owner, or whether a mere easement shall be taken, without divesting the fee and general ownership of the land? It seems to me entirely clear, that all these powers must, of necessity, rest in the legislature, in order to secure the useful exercise and enjoyment of the right in question. A case might arise where a temporary use would be all that the public interest required;
 
 [1]
 
 another case might require the permanent and apparently the perpetual occupation and enjoyment of the property by the public; and the right to take it must be co-extensive with the necessity of the case, and the measure of compensation should, of course, be graduated by the nature and duration of the estate or interest of which the owner is deprived.
 

 Where, as in this case, a fee-simple absolute was deemed necessary, and was taken, all the loss and damage of the owners and others interested, by and in consequence of their relinquishing the same, was directed
 
 *325
 
 to be, and was, in fact, paid; this must necessarily have included the whole value of the inheritance. There would be no justice or equity, in paying the owners anything more, at any time or under any circumstances. That the use by the public of the lands in question might cease, was a possibility, but was not contemplated at the time; the site of the almshouse at Bellevue was supposed to be fixed and permanent, and the annexation to it of the lands in question was designed and expected to be also permanent. There could, therefore, be no just measure of compensation, but the whole value of the lands, with the damages for relinquishing them; and that being paid, justice could *not be done .. ^ ^g to the corporation of the city, without allowing *- the latter to hold the lands, as the act provides, in fee-simple absolute.
 

 After the lapse of twenty-six or twenty-seven years, circumstances had risen, justifying a removal of the almshouse establishment to another place, and it followed, that the identical lands in question were no longer required, at that place for the purpose for which they had been taken. If, under such circumstances, they are to revert, it must be for the reason that the corporation had only acquired a use, upon the determination of which, their right was at an end. If this be so, the appellants, it seems to me, are entitled to the whole reversion, without accounting for what they or their ancestors have received. Their title, if they have any, is a legal one; it is the same which their ancestor had, when the lands were taken.
 

 To uphold their claim would be to establish a principle pregnant with great injustice and most mischievous in its consequences. Suppose, the corporation had, at their own expense and in good faith, covered the lands in question with expensive buildings for the uses of the almshouse, and circumstances unforeseen by them had rendered necessary a removal of the establishment to an
 
 *326
 
 adjoining block, and the possession of these lands thereby become unavailable for the purpose originally contemplated and for which they were appropriated. The appellants would have the right to resume them, upon the same principles which would entitle them to prevail in this case. No one can fail to see the iniquity of such a result; it would be paying them in full for the lands, and allowing them to have them also.
 

 The appellants propose to obviate this apparent injustice by an equitable account. If an account, under such circumstances, is to be had in one case, it should be taken in every case where either party demands it. If the property had depreciated, it would be the interest of the corporation to have an account, which the owners would scarcely agree to. Besides, to allow an accounting in such a case, would be a new feature in equitable jurisprudence, without precedent, and not called for by * 0917 -i "any equities of the case. A man is called upon -* to give up and part with his property for the public use; it is reasonable that he should do so, and the law requires it of him; a full indemnity is all that he can ask in return, and should satisfy him; having received it, a demand for anything beyond must be founded upon a rule anything but equitable.
 

 Considerations of the character of the foregoing, among others, have led me to the conclusion, that the legislature should possess the power which they have exercised in the present case; and having found no authority to the contrary, I am satisfied of its existence. Such too, I am persuaded, were among the reasons which induced the legislature to provide that the title to be acquired by the city should be one in fee-simple absolute.
 

 Decree affirmed.
 
 [2]
 

 [1]
 

 See Heard v. Brooklyn, 60 N. Y. 242 ; Strong
 
 v.
 
 Brooklyn, 68 Ibid. 1.
 

 [2]
 

 To the same effect, see Rexford
 
 v.
 
 Knight, 11 N. Y. 308, and Gearty v. New York, 49 How. Pr. 33.