## THE WATER WORKS COMPANY OF INDIANAPOLIS ET AL. *v.* BURKHART ET AL.

EMINENT DOMAIN.—*Legislative Authority.—Delegation of Power.*—The right of eminent domain is inherent in the government. It is not conferred, but limited, by the constitution, and the limit is not upon the amount of the estate to be taken, but it only requires just compensation. No property can be taken without legislative authority, and in the manner, and for the purposes, and to the extent authorized. Courts cannot extend or limit these. The necessity for such condemnation must be determined by the legislature, and cannot be questioned by the courts. If the legislature attempt under this power to take property confessedly not for public use, then the courts may prevent it. Where the State has taken a fee simple or authorized the taking thereof, and compensated the owner therefor, the subsequent abandonment of the use will not reinvest the owner with the title. If simply an easement is taken, the rule is otherwise. The right of determining the necessity of the work may be

delegated, and courts and juries may be called upon to determine as to its necessity.

SAME.—*Canals.—Ice.*—The legislature of this State authorized its public agents to appropriate a fee simple in the lands taken for the construction of its canals. The former owner had no right to take ice from the canal.

STATUTE.—*Repeal by Implication.*—The law does not favor the repeal of statutes by implication, and when courts hold that a statute or any provision thereof is repealed by implication, it is done in obedience to the legislative will as manifested in the act. It must appear that the subsequent statute revised the whole subject-matter of the former one, and was evidently intended as a substitute for it, or that it was repugnant to the old law.

EMINENT DOMAIN.—*Canal.—Right to Take Ice.*—Edgerton *v.* Huff, 26 Ind. 35, overruled.

APPEAL from the Marion Civil Circuit Court.

OSBORN, J.—The appellees sued the appellants, and in their complaint it is alleged that they are tenants in common and owners in fee simple of a tract of land, described in the complaint, through which the Central Canal runs, in Marion county. "That as such owners they have the right, and are entitled, to cut the ice growing upon the Indiana Central Canal, where the same runs through the premises, using ordinary care, and without unnecessary damage to the canal; that the defendants claim that they are the owners of the canal, and have the sole and absolute right to cut the ice growing upon it, to the exclusion of the plaintiffs; that during the winter of 1871 and 1872, the defendants prevented the plaintiffs from cutting the ice growing upon the canal, where the same is situated upon and runs across the real estate of the plaintiffs aforesaid. And the plaintiffs say that by reason of such unlawful interference of said defendants, in preventing the plaintiffs from cutting ice upon said canal, and selling the same as merchandise, the plaintiffs were deprived of large incomes, profits, and gains, to which they were lawfully entitled as the owners of the real estate."

They demanded judgment for five thousand dollars, and an order that they were entitled to and had the right to cut the ice growing upon the canal, without hindrance by the defendants, and for all proper relief.

The general denial was pleaded, and the cause was tried

by the court, resulting in a finding for the appellees for fifty dollars. The appellants filed a motion in which they severally moved for a new trial; first, because the finding of the court was not sustained by sufficient evidence; second, because the finding was contrary to law.

The motion was overruled, to which proper exceptions were taken, a bill of exceptions was filed, and judgment was rendered on the finding.

The errors assigned are, first, that the court erred in overruling the motion for a new trial; and, second, in rendering final judgment against the appellants.

The evidence is in the record, and consists in an agreed statement of the facts, as follows:

The plaintiffs below, the appellees, are the heirs of Andrew J. Burkhart, deceased, who died intestate. The real estate described in the complaint was, on the first day of January, 1836, the property of Nathaniel West, who was seized in fee simple of the same. West died in 1843, leaving certain heirs, naming them, and by agreement amongst the heirs, and certain partition proceedings mentioned, this land was set apart and partitioned to certain of the heirs named, through whom, by regular conveyances, the title became vested in Burkhart. No question has been made about the appellees' title to the land, except as it may be affected by the appropriation for the canal.

The Board of Internal Improvements, for the purpose of constructing the Central Canal, and to procure a right of way therefor, appropriated a strip of land through said real estate, and constructed thereon the bed of said canal, its banks, margins, and towpaths. West's damages, occasioned by such appropriation, were assessed, as provided by law, and paid to him as follows: September 30th, 1837, seven hundred dollars, and February 25th, 1839, two hundred and fifty dollars. The Board of Internal Improvements entered upon the strip of land so appropriated, and constructed upon it the bed, banks, margins, and towpaths of the canal. The canal thus constructed continued the property of the State,

and in its possession, until the 30th of June, 1850, when it was conveyed by the governor and auditor, by deed, to Francis A. Conwell, assignee of George G. Shoup, James Raridan, and John S. Newman, the deed being the same mentioned in the preamble to an act passed March 9th, 1859, for the relief of the lessees from the State of the water power, etc., on the northern division of the Central Canal, etc.

The Central Canal, which was constructed by the State under the acts upon the subject of internal improvements and conveyed to said Conwell, is the same canal passing through the real estate described in the complaint, and through the city of Indianapolis, and the portion thereof passing through said real estate is the subject of litigation in this action.

The canal passed by a united chain of title, by proper conveyances, to the defendant, The Indiana Central Canal Company, a corporation organized and created on the 13th of January, 1863, under "an act to provide for the organization of canal and water works companies, and for the completion of the unfinished canals in the State of Indiana," approved June 17th, 1852.

The defendant, The Indiana Central Canal Company, on the 1st day of May, 1870, by a proper deed of conveyance, conveyed said canal to the defendant, The Water Works Company of Indianapolis, a corporation organized under an act authorizing the formation of companies for the construction, etc., approved March 6th, 1865. The company was organized on the 7th day of October, 1869. The articles of association are set out, and by the sixth its business was declared to be "that of furnishing water, which it may do to the city and citizens of Indianapolis, the State, public institutions, firms, and individuals, and all desiring the same in said city and the vicinity thereof."

The agreed statement of facts concludes as follows: "The plaintiffs claim the right to pass upon and over the banks of said canal, where it passes through said real estate, doing no

unnecessary damage thereto, when the water in said canal is frozen, and the water in the same cannot be used for navigation or hydraulic purposes, and cut ice upon said canal, and carry it away, to be used as a matter of merchandise.

"The defendant, The Water Works Company of Indianapolis, denies this right, and during the winter of 1871 and 1872, prior to the bringing of this suit, forbade its exercise by the plaintiffs, and deprived them of it.

"That the exercise of this privilege by the plaintiffs is a valuable one, and it is agreed that if upon the facts of this case the plaintiffs are entitled to the privilege claimed by them, their damages shall be assessed at fifty dollars. If, upon the contrary, under the facts of the case, the plaintiffs are not entitled to the privileges claimed by them, then the finding of the court shall be for the defendants."

The real question to be decided is, what interest did the State acquire in the land by the appropriation? It appropriated, paid for, and took possession of, a strip of land, the width of which is not stated, and constructed upon the strip so appropriated the bed, banks, margins, and towpaths of the canal, and continued to own and possess it until conveyed in 1850. And the defendants, claiming under several regular conveyances, now own, and are in possession of, all that the State acquired. It is not claimed that there has been any abandonment or forfeiture of any right thus acquired. The plaintiffs below, the appellees, only claim, in their complaint, that they have the right to cut the ice formed upon the canal where it passes through their land, using ordinary care, and without unnecessary damage to said canal. And, in the agreed case, they claim the right to pass over the banks of the canal where it passes through their land, doing so with ordinary care, and doing no unnecessary damage thereto, when the canal is frozen, and the water in the same cannot be used for navigation or hydraulic purposes, and cut ice upon it, and carry the same away, to be used by them as a matter of merchandise.

It is admitted that the State acquired, and that the defend-

ants now own, some interest in the canal, where it passes over and across the appellees' land, including its bed, banks, margins, and towpaths; that the State took possession of this strip, and thereon constructed the canal, its banks, margins, and towpaths, during the existence of the Board of Internal Improvement, and that the State, and those holding under it, continued in the possession of such strip, until the bringing of this action, and during the time that the plaintiffs claim damages for being deprived of the right to go upon and take ice from the canal.

A supplemental brief has been filed, in which, among other things, it is claimed that The Water Works Company is not authorized to own and maintain a navigable canal, and therefore could not take the Central Canal; but it is expressly agreed by the appellees, that if they are not entitled to the privileges claimed, the finding of the court shall be for the defendant.

Hence, we think, we have really only to determine what power the legislature possessed to appropriate the property, and what interest or estate was appropriated.

And first, as to the power.

The right of eminent domain, that is, the ultimate right of the sovereign power to appropriate, not only the public property, but the private property of all the citizens within the territorial sovereignty, to public purposes, is inherent in the government; without this power, the State could not establish and open a highway of any kind. No railroad, canal, or turnpike could be constructed; no ground upon which to build a public building could be procured by the State, or government, in any other way than by contract with the owner. It is not conferred, but limited by the constitution. The limitation does not relate to the amount of the estate in property to be taken; only that "no man's property shall be taken by law without just compensation, nor, except in case of the State, without such compensation first assessed and tendered."

VOL. XLI.—24

It is to be exercised only when the public exigencies require it. And when such exigency or necessity is declared by the representative of the sovereignty, the legislature, the courts cannot rightfully question the wisdom of the declaration. No property can be taken for public use by condemnation otherwise than by legislative authority, and in the manner and for the purposes authorized. Courts cannot extend or limit it. The power to condemn land for a turnpike gives no power to condemn for a railroad, although, in fact, the necessity for the latter may be greater than for the former. There may be no necessity for constructing a railroad along side of, and parallel to, another; yet, if the legislature has declared the public necessity for it by authorizing its construction, and conferred the right to appropriate the requisite land for that purpose, courts cannot prevent it by questioning the necessity for the work.

If the legislature attempts, under the power of taking property under the right of eminent domain, to take property confessedly not for public use, then the courts may prevent it. And here, it seems to us, is where a misconception arises. It is said, and admitted, that no more shall be taken than is necessary for the public, but the manner of determining that question, and the tribunal before which it shall be determined, has, by many, been entirely overlooked. And the case of *In re Albany Street*, 11 Wend. 149, has been referred to as sustaining the doctrine that the courts would undertake to decide, in the face of a legislative declaration of public necessity, that no such necessity existed. An examination of that case will show that it was an attempt to appropriate what the legislature admitted was not necessary. The act under which it was proposed to take the land, provided that when a part of a lot was required, if the commissioners deemed it expedient to include the whole lot in the assessment, they might do so, and the part not wanted for the street, etc., should become vested in the corporation, who might appropriate it to public use, or sell it. It was held that the corporation could not appropriate the part of the lot not wanted

for the street; that is, the owner could not be required to sell what it was admitted the public necessity did not require; that if a part of a lot was demanded by public exigency, that did not confer the power to take the remainder as a matter of expediency. *Embury* v. *Conner*, 3 Comst. 511, was made under the same, or a statute with similar provisions.

In the case of *The People* v. *Smith*, 21 N. Y. 595, DENIO, J., says, on page 598:

"The necessity for appropriating private property for the use of the public or of the government is not a judicial question. The power resides in the legislature. It may be exercised by means of a statute which shall at once designate the property to be appropriated and the purpose of the appropriation; or it may be delegated to public officers, or, as it has been repeatedly held, to private corporations established to carry on enterprises in which the public are interested. There is no restraint upon the power, except that requiring compensation to be made." The court held that the party was not entitled to be heard on the question of the expediency of making the appropriation.

The exercise of the right of eminent domain stands on the same ground with the power of taxation. Both are emanations of the law-making power. They are the attributes of political sovereignty, for which the legislature is under no necessity to address itself to the courts. "In imposing a tax or in appropriating the property of a citizen, or a class of citizens, for a public purpose, with a proper provision for compensation, the legislative act is itself due process of law."

In *United States* v. *Harris*, 1 Sumner, 21, on page 42, Judge STORY says: "The right, therefore, to take private property for public uses is limited to cases of public exigency. If the legislature expressly, or by necessary implication, state the exigency to exist, and the extent to which the property is to be taken, that would in common cases be decisive."

In *Ford* v. *The Chicago, etc., R. R. Co.*, 14 Wis. 609, it was

decided, that "the propriety of taking property for public use is not a judicial question, but one of political sovereignty, to be determined by the legislature, either directly or by delegating the power to public agents, proceeding in such manner and form as may be prescribed."

In *Kane* v. *The Mayor, etc.*, 15 Maryland, 240, it was held, that under the forty-sixth section of the third article of the constitution of that State, and the act of the legislature authorizing the city to adopt means for supplying the city with water, the authority was not given to take property for all purposes, but for "the purpose of conveying water into said city, for the use of said city, and for the health and convenience of the inhabitants thereof." The opinion was not unanimous. Tuck, J., dissented, on the ground that the act of the legislature made the city authorities judges of the expediency and necessity of what property was needed, etc. But the majority seem to have decided that an issue of fact could be formed, and evidence heard, as to the public exigency.

We think such a doctrine untenable, and, that, practically, it would lead to confusion. If courts can call in question, and control the extent of the interest or estate which the legislature may authorize to be taken, we can see no reason why the exercise of the power to appropriate and take any interest may not in like manner, and for the same reason, be questioned and controlled, or even denied and prevented. On the same ground, the right to appropriate land upon which to construct a railroad can be called in question. An issue of fact can be made, that the public exigency does not require the construction of the road, or the amount of land which the legislature has authorized to be taken. And thus courts and juries would be sitting in judgment and passing upon what the legislature had decided was required by the public. And the result might be that different verdicts and judgments might be rendered, relative to the power to take parts of adjoining tracts of lands, for the same purpose and on the same state of facts. One jury might decide that the

road was, and another that it was not, required by the public wants. One might decide that the quantity of the lands that the legislature had authorized to be taken was, and another that it was not, necessary; and thus the construction of any railroad could be defeated by the verdict of a single jury; an act of the legislature nullified by the judgment of a single court.

*Heyward* v. *The Mayor*, etc., 7 N. Y. 314, discusses this question, and as the language of the court in that case accords with our views, we quote from it. After speaking of the doctrine of eminent domain, the court says, on pages 324–5: "With these general views of the right of eminent domain, it is proper to inquire with a little more particularity and precision into its character and extent. Does it imply the right in the sovereign power to determine the time and occasion and as to what particular property it may be exercised? Most clearly it does, from the very essence and nature of the right. To deny it would be to abrogate and destroy it. 2 Kent Com. 340, 3d ed.; *Beekman* v. *Saratoga*, etc., *R. R. Co.*, 3 Paige, 73; *Varick* v. *Smith*, 5 Paige, 159, 160. Shall the same power determine the estate or quantity of interest in the lands which shall be taken; whether an estate for years, for life, or in fee; whether a right of reversion in any event shall be left in the owner, or whether a mere easement shall be taken, without divesting the fee and general ownership of the land? It seems to me entirely clear that all these powers must of necessity rest in the legislature, in order to secure the useful exercise and enjoyment of the right in question."

In that case, under an act of the legislature, certain real estate had been appropriated, taken, appraised, and paid for by the city of New York, for the purpose of extending the almshouse establishment. It was provided in the law under which it was taken, that the city should be seized in fee simple of the lands, tenements, and premises so taken. The city took possession of the land, and occupied it for many years for the purposes for which it was authorized to take it.

Afterward, the city resolved to remove the almshouse to Randall's Island, and surveyed the land so taken and laid it out into city lots, and sold them, and conveyed the lots by deeds, with covenants of general warranty. A suit was afterward brought for an account of the amount realized on the sale beyond the sum originally paid on the condemnation. The court held that the legislature had the power to authorize the appropriation of the fee simple; that when so appropriated and paid for, no reversionary interest or estate remained in the former owner, and if the public exigencies required the conversion of the property to some other public purpose, it could be done, and that no action lay for the account; that having received a full indemnity, and payment for the property, the former owner was not entitled to anything more.

*De Varaigne* v. *Fox,* 2 Blatchf. C. C. 95, seems to have been upon the same facts, and with the same result.

In *Haldeman* v. *Pennsylvania Central R. R.,* 50 Pa. St. 425, it is said, that it is not to be overlooked that the reason why the right of the owner of the land taken reverts to him when the public cease to use it for the purpose for which it was taken, is because the State made, at first, but a partial appropriation; that if the fee had been acquired by purchase, or taken through its right of eminent domain, and devoted to public use as a highway, a cessation of that use could revest nothing in the former owner; that his rights would be gone and he could not resume possession.

In *Rexford* v. *Knight,* 1 Kernan, 308, a strip of land had been taken, and at one time actually occupied and used, as a part of the Erie canal; when the canal was enlarged, its location was changed, and the premises in controversy were no longer used for that purpose.

The question was, whether the title did not revert to the original owner. The court held that it did not; that the language of the act of the legislature that the property should be deemed the property of the State, excluded the idea that any one else retained a property in it; that it was

so broad as to require a fee; and that under such a state of the title, the lands would not revert upon the abandonment of their use for the purpose of a canal. Courts have decided that where an easement is taken, as is usually done in establishing common highways, the fee remains in the owner, and when the road is vacated the right appropriated reverts. In such cases the public only gets a right of passage; that is all that the legislature has declared to be necessary. So in some railroad charters, a grant is made to the company to appropriate land for its use, for right of way, depot grounds, and the like, with a provision that when the provisions of the charter have been complied with, the company shall be seized of the lands so taken in fee simple, whilst in others only an easement is granted. There may be, in fact, the same necessity for a fee simple in both cases, yet the courts cannot inquire into and decide that such necessity does or does not exist, or change the estate acquired. And so the legislature may grant to different companies power to take a greater or less quantity of land, and such grant will be conclusive as to the necessity for the uses specified. The right of determining the necessity of the work may, undoubtedly, be delegated, as is done in this State in the establishment of common highways, and the erection of mill-dams, and in those cases the courts and juries may be called upon to determine as to its necessity. But the legislature is the sole and exclusive judge of the public exigency, and of the mode and manner of exercising the right of taking the property required, subject only to the limitation of making proper provision for ascertaining and making compensation for the property taken.

We do not consider it necessary to further refer in detail to authorities, but cite a few of the many examined. *Dingley* v. *City of Boston*, 100 Mass. 544; *The Brooklyn Park Comm'rs* v. *Armstrong*, 45 N. Y. 234; *Hatch* v. *Cincinnati, etc., R. R. Co.*, 18 Ohio St. 92; *Cooper* v. *Williams*, 4 Ohio, 253; *In the matter of the Water Commissioners* v. *Lawrence*, 3 Edw.

Ch. 552; *New Castle, etc., R. R. Co.* v. *Peru, etc., R. R. Co.,* 3 Ind. 464; *Craig* v. *Mayor, etc.,* 53 Pa. St. 477.

We proceed to inquire what estate the Legislature authorized its public agents to appropriate in lands taken for the construction of its canals.

By an act of the General Assembly, approved January 9th, 1832 (Acts of 1832, p. 3), the duties of the canal commissioners were defined and extended. It will be unnecessary in this case to state all of their duties. They were authorized to construct the Wabash and Erie canal as far as located, and of the residue of the canal aforesaid, from the Ohio state line to the Tippecanoe river, as established by the act of the General Assembly mentioned. Section 9, p. 6, provided, that "it shall and may be lawful for said canal commissioners, or each of them, or any of their agents, superintendents, engineers, or workmen acting under them, to enter upon and take possession of, and use all and singular, any lands, or waters, streams and timber, stone or materials of any kind, necessary for the prosecution of the improvements contemplated by this act; and to make all such canals, feeders, dykes, locks, dams, and other works, as they may think proper in said prosecution, doing however no unnecessary damage." The commissioners were authorized to receive, on behalf of the State, from the owners of any such lands, such grants and conveyances as might be proper and competent to vest a good title thereof in the State, and also to receive grants of such materials as they might need. Provision was also made for estimating the loss or damage, if any, over and above the benefit arising from the canal to such owner, in said premises or materials taken and appropriated for any of the purposes mentioned, in case the same should not be given or granted. Section 11, p. 7, prohibited the erection of any bridge across said canal, the building of any wharf, basin, or watering place; the making or applying of any device whatever, for the purpose of diverting or turning any water from the said canal, or the feeders connected therewith, without first obtaining permission therefor from the

canal commissioners, under a penalty not exceeding one thousand dollars. By section 19, p. 53, Acts of Feb. 1st, 1834 (Acts, 1834, p. 49), a penalty was imposed upon any one who should lead, drive, or ride any animal, horse, ox, mule, or other animals, upon the towing-path or berme-bank of the Wabash and Erie canal, except for the purposes of conveying articles to and from said canal, for transportation on its waters. Section 18, same page, authorizes the commissioners to procure, "by purchase or otherwise," land at each and every point on or adjoining the Wabash and Erie canal, where its surplus water might be profitably used for hydraulic purposes. By act of February 6th, 1835, p. 25, section 4, p. 26, the commissioners were directed to file all applications for damages growing out of the construction of the Wabash and Erie canal, or works connected therewith, for the location or completion of the canal, or any of the structures thereto appertaining. The board of appraisers should make an equitable assessment of the damages, etc., make regular entries of their award, in each case, in a book to be kept for that purpose, and the commissioners were then required to pay the several awards, which should vest a fee simple in the premises so appropriated in the State.

Section 5 required the governor to appoint appraisers, and prescribed their duties. Section 6 provided for leasing the surplus water, not needed for navigation, but prohibited selling or leasing such surplus water unless the ground on which it was proposed to be used should be the property of the State. Section 7 reserved to the State the right to resume the use of the water whenever it was deemed necessary for purposes of navigation. Section 10 of the same act, p. 28, directed the canal commissioners to survey and locate a canal, from a suitable point on the Wabash and Erie canal, *via* Muncietown, etc., and Indianapolis, at or near the White river, thence to a point on the Ohio river.

The act of 1836, p. 6, provided for a general system of internal improvement. Section 1 provided for the appointment of a board of internal improvement. Section 2 provided,

among other things, that the board should take the same oath then required by law of the canal commissioners. Section 4 specified the works which the board was to adopt measures to commence, construct, and complete, including the Central canal (which was the same that was authorized to be surveyed and located by section 10 of the act of February 6th, 1835), and an extension of the Wabash and Erie canal. Appropriations were made for each particular work. Section 16 authorized the board, and each of its members, by engineers, etc., to enter upon and take possession of, and use, any lands, streams, and materials, for the prosecution and completion of any of the improvements contemplated by the act. Section 17 prescribed that persons feeling aggrieved or injured by the construction of the works, etc., should file with the member of the board having the superintendence of the work, which was supposed occasioned the injury, a written statement of the cause of complaint. The board should refer it to appraisers to be appointed by them, and fix the time of the meeting of such appraisers, etc. The award of the appraisers should be final, unless appealed from to the circuit court; and when the appeal was taken, it should be governed by the same rules and regulations as appeals from justices of the peace. It also provided that the board should pay the amount fixed by the appraisers or court. What should be the tenure of the state to the ground taken, or appropriated and appraised, is not declared by the act. Section 21 fixes the compensation of the appraisers, and repeals so much of the laws in force as provides for creating, continuing, or compensating a state board of appraisers. It does not seem to have been the intention of the General Assembly to repeal all former laws on the subject. The act changed the officers having the control and management of the works. It created a board of internal improvement, and gave to that board the powers theretofore conferred upon the canal commissioners, with some modifications. It authorized the construction of many works not before authorized, including railroads, macadamized and turnpike roads.

So that the name of "canal commissioners" ceased to be appropriate or proper. It seems to have been the purpose of the state to continue all the works already commenced, and also to commence and prosecute others, under the same laws, so far as the same might be applicable under the new board of internal improvement. The manner of appropriating the property, taking the releases and appraising damages for the property taken, was substantially the same under both laws. Under the act of 1835, it is provided, that payment of the award of damages should "vest the fee simple of the premises so appropriated in the state." Acts of 1835, p. 26, sec. 4. The act of 1836 provided, that the board of internal improvement should pay the award, and was silent as to the effect of it. Acts of 1836, p. 13, sec. 17. Both acts provided for taking and appropriating the land; for filing a statement of the claimant; for an assessment of his damages; an appeal and trial in the appellate court, and payment of the damages assessed or awarded. The only real change was, that by the act of 1835 the governor appointed a board of appraisers, whilst under the act of 1836 the board of internal improvement referred each case to three disinterested persons, selected by themselves. The state, prior to the act of 1836, had undertaken the construction of the Wabash and Erie canal; it had authorized the survey and location of a canal, which, by the last named act, was designated as and called the Central canal, from some point on the Wabash and Erie canal, and other canals, railroads, turnpikes, and macadamized roads. In the act of 1835, which declared that the appropriation and payment of the award of damages should vest the fee simple of the land taken in the State, provision is made for the location of the Central canal and many others of the works which were placed under the control of the board of internal improvement by the act of 1836. The commissioners were to make estimates of the cost of some of the works, and lay them before the then next General Assembly. The next General Assembly passed the act of 1836, and placed not only the

Wabash and Erie canal, but all the public works of the state under the control of the board of internal improvement. The board was charged with the extension of the Wabash and Erie canal, in the same act that directed them to locate and construct the other works. By a law already in force, the effect of condemning land, whereon to construct that canal, was to vest the fee simple in the state. The state was about to embark in a more extensive system, to undertake the construction of other canals, etc., and the completion of this one already commenced. We are to determine whether the state intended to take a less estate in the ground appropriated for the extension of that canal, and in the construction of the others, than she had before taken, and declared it necesssary to take, for its construction.

The argument of the appellees is, that by the act of 1836 all other acts on the subject were repealed. It is not denied, that by condemnation the state acquired the same estate in the land condemned, whether it was for the Wabash and Erie, or any other of the canals authorized to be constructed by the board. Indeed, we do not see how it could be. They were to be located and constructed by the same board, and for the same purpose. Evidently the legislature considered that there was the same necessity for all, and it intended to confer and extend the same power for the benefit of all. The legislation is *in pari materia.*

By the act of 1835, the appraisement and payment of the damages vested the fee simple of the land appropriated in the State, and unless that act was repealed by the act of 1836, such would continue to be the effect of such appraisements and payment. The only express repealing clause in the act is in section 21, page 15, which repeals so much of the laws then in force, as provided for creating, continuing or compensating a state board of appraisers.

The law does not favor a repeal by implication; and though two acts may seem to be repugnant, courts will so construe them that, if possible, the later shall not operate

as a repeal. *Bruce* v. *Schuyler*, 4 Gilman, 221; *Blain* v. *Bailey*, 25 Ind. 165.

The re-enactment of an existing provision of a law, in a later statute, does not, necessarily, repeal such former provision. 22 Ind. 1; 9 Ind. 337; 10 Ind. 566. The law does not favor repeal of statutes by implication, but requires clearly repugnant language to effect a repeal. 5 Ind. 41; *Coghill* v. *The State*, 37 Ind. 111. Where courts hold that a statute, or any provison thereof, is repealed by implication, it is done in obedience to the legislative will, as manifested in the act. It must appear to have been the intention of the legislature. *Tyson* v. *Postlethwaite*, 13 Ill. 727. Judge CATON, on page 734, says: " This principle is illustrated in the opinion of Lord Ch. J. NORTH and the other judges, in an answer to a question put to them by the Privy Council, reported by Sir Thomas Raymond, at page 397. There a perpetual law had been passed, granting certain revenue out of strong liquors; and subsequently another law was passed, granting the same revenue for two years; and it was held that the last law did not repeal the first, but that the latter continued after the expiration of the former. 'According to the case of the prices of wine, Hob. 215, where by 37 Henry 8, chap. 23, a perpetual law was made for settling prices of wine; then, by the statute of 5 Edward 6, the said perpetual act (through the inadvertence of parliament) was continued, amongst other acts, till the end of the parliament, which continuance was resolved to be idle as to that act; for an affirmative continuance of a perpetual statute cannot work an abrogation thereof.' " So a general statute, without negative words, will not repeal a particular provision of a former one, unless the two are irreconcilably inconsistent. Sedgw. Statutory Law, 123.

The case of *Haldeman* v. *Pennsylvania Central R. R.*, 50 Pa. St. 425, in some particulars is like this. The State of Pennsylvania, in 1826, enacted a law for appropriating land for a canal, and, on complying with its terms, vesting the title as of an absolute estate in perpetuity in the State. In 1827,

another act was passed, making some changes in the mode of ascertaining damages. In this second act there is no direct reference to the estate, or quantity of interest, which the State would acquire in the lands by the appropriation. After an acquisition, subsequent to the second act, of land for the canal, and constructing the canal upon the land thus acquired, the State filled up and removed the canal from the land, and appropriated it to other uses and purposes from that for which it was originally taken. In an action of ejectment, it was held that the land did not revert to the former owner; that, standing alone, the second act did not seem to contemplate an acquisition of the fee, but that the acts of 1826 and 1827 were *in pari materia;* that the latter did not repeal the former, except so far as it made inconsistent provisions for compensating owners of land taken, and that both acts must be construed together as parts of one system.

It seems to us that it was not the purpose of the legislature, by the act of 1836, that the State should abandon any work or system already commenced, or acquire any less estate in lands to be thereafter taken for the construction of any of its public works. On the contrary, it appears to have been the purpose, not only to finish all that she had undertaken, but to commence and finish others, and she conferred the management and control of the whole of them upon the Board of Internal Improvement, with authority to take and appropriate lands for the construction of all of them, without distinction or discrimination.

It is said by the appellees that the act of 1836 repealed all prior laws on the subject; that it covered the subject of the old ones, and therefore took their place; that it was a revision, embracing the same general subject-matter, and reduced all the old laws into one, and hence was a virtual repeal of them, without any express provision to that effect. A number of authorities are cited to sustain the position.

*Goodenow* v. *Buttrick*, 7 Mass. 142, is the first cited. In that case, Bigelow, for defendant, contended, as the appel-

lees do here, that the former laws were repealed by implication, and that it had been always considered that the revised statutes virtually repealed the old laws *in pari materia*, without any express clause of repeal. But the court held that the last act did not repeal the act relied on by the plaintiff in that case; that it did not appear to comprise several provisions of the former laws, undoubtedly intended to be preserved.

*Bartlet* v. *King*, 12 Mass. 555, is the next. In that case it was held that the subsequent statute, revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contained no express words to that effect, must, on general principles of law, as well as in reason and common sense, operate to repeal the former.

*Norris* v. *Crocker*, 13 How. U. S. 429, is the next. In that case, on page 439, it is said: "The recent statute covers every offence found in the former act, which subjects the offender to a penalty of five hundred dollars, and prescribes a new, and different penalty, recoverable by indictment; and is plainly repugnant to the act of 1793."

*United States* v. *Tynen*, 11 Wal. 88, is the next and last case cited on that point. In that case, on page 92, Mr. Justice FIELD said: "When there are two acts on the same subject the rule is to give effect to both if possible. But if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first."

It must appear that the subsequent statute revised the whole subject-matter of the former one, and was evidently intended as a substitute for it, or that it was repugnant to the old law. In other words, it must appear that it was the intention of the law-makers to repeal the former law. When that appears, the will of the law-makers is just as manifest as if it had been shown by express words.

As early as 1832, the legislature, by law, declared that the condemnation of land for the construction of the canal should vest a good title to the premises in the State. It

claimed absolute dominion over, and the exclusive possession of, the canal. It prohibited the diversion of water from it, the construction of any bridge across it, etc., without first obtaining permission from the commissioners, and imposed a penalty for offending against the prohibition, not exceeding one thousand dollars. It authorized the commissioners to receive grants and conveyances for the construction of the canal as might be proper and competent to vest a good title in the State. In 1834, it asserted its right to exclude all persons from the banks of the canal by declaring that every person who should lead, drive, or ride any horse, ox, mule, or other animal upon the towing path or berme-bank of the canal, except, etc., should forfeit three dollars. In 1835, it provided, that the condemnation of land should vest the title, in fee simple, in the State. In 1838, it was enacted that every person who should lead, ride, or drive any horse, ox, or other animals drawing after them any cart, dray, or other carriage upon the towing path or berme-bank of any of the canals of this State should forfeit fifteen dollars. It again prohibited the construction of bridges, wharves, basins, etc., except under the direction of the commissioners. Indeed the entire legislation of the State has been based upon the theory that she had the entire ownership of, and dominion over, the canals and their banks, and that the owners of the land through which they were constructed had no right to the possession of them. The State did not tolerate any privilege or rights in any one to go upon the canal, or its banks, at any time, as a matter of right. It could only be done by permission. She did not recognize the right of the owner of the land through which the canal ran to go over and upon its banks, or take from it anything, simply because it did not, for the time being, interfere with the use of the water for hydraulic purposes, or the navigation of the canal, or that no injury was done to the canal. Having declared the necessity for the ownership and exclusive possession of the land, she denied the right to any and all others to enter upon it, at any time, without her permission. She occupied

this position until the transfer of her interest. The entire history of the legislation and action of this State shows that it was not her intention to repeal the law by which the fee simple of the lands taken for the canals was vested in the State. It shows that her intention and policy was to exclude all persons from the possession of such lands, unless by her permission. The claim exercised by the State continuously from 1832 to the entire and absolute ownership and exclusive possession of the property appropriated and seized for the construction of its canals was utterly inconsistent with any joint or temporary use or possession by the former owner. The courts also recognized the interest taken to be the entire estate, and allowed the owner the full value of it in estimating his damages. *Vanblaricum* v. *The State*, 7 Blackf. 209. That was a case for damage occasioned by this same Central canal. The same rule was recognized in *M'Intire* v. *The State*, 5 Blackf. 384.

In the first named case, Judge BLACKFORD uses this language: "In estimating the complainant's damages, the jury were to ascertain the value of his land, taken for the canal, at the time it was taken." It was not the value of an interest, or estate, in the land less than the whole, but the value of the land taken, that was to be estimated.

Our conclusion is, that it was the intention and purpose of the legislature, by the legislation on the subject, to appropriate a fee simple in the land seized or taken for the construction of her canals as well after as before the act of 1836.

Our conclusion is in conflict with *Edgerton* v. *Huff*, 26 Ind. 35. The court in that case based the right of the trustees of the canal entirely upon the act of 1836, and instead of considering the prior legislation on the same subject in aid of the right acquired by the State, it was regarded as weakening it, while we regard the entire legislation on the subject as parts of one system, the former not repealed unless by express enactment, or by necessary implication. In that opinion the power of the legislature is not questioned,.

VOL. XLI.—25

nor is the conclusiveness of the legislative declarations of the public exigency questioned. It simply holds that by the act of 1836, standing by itself, the legislature did not attempt to appropriate anything more than an easement.

In *Haldeman* v. *Pennsylvania Central Railroad, supra,* it was insisted that the act of 1827, under which the land was taken, did not authorize the taking of a fee. The court said: "There is no direct reference in this second act to the estate or quantity of interest which the commonwealth should acquire in the lands appropriated without purchase and for which the compensation to be made was to be settled by viewers, and if it is not to be construed in connection with the first act, there is nothing in it that gives any different effect to the appropriation from that which generally results from laws providing for taking private property for public use as a highway. Standing alone the act does not seem to contemplate an acquisition of the fee by the commonwealth. But the acts of 1826 and 1827 are *in pari materia.* It follows that both acts must be construed together, as parts of one system."

We cannot, of course, tell what the court, as then constituted, would have held if the question had been presented as it has been to us. Yet we cannot but believe that its conclusions would have been the same as ours are in this. At all events, it does not seem to have been considered. That case is overruled.

The judgment of the said Marion Civil Circuit Court is reversed, with costs, with instructions to grant a new trial, and on the said agreed statement of facts to find and render a judgment for the defendants.

*T. A. Hendricks, O. B. Hord, A. W. Hendricks, A. G. Porter, B. Harrison, C. C. Hines, S. E. Perkins,* and *S. E. Perkins, Jr.,* for appellants.

*J. Hanna, F. Knefler,* and *B. K. Elliott,* for appellees.

The appellant, in argument, presented the following points and authorities:

The State acquired a fee simple by the condemnation of real estate for canal purposes, under the internal improvement act of the 27th of January, 1836.

The Water Works Company of Indianapolis *et al. v.* Burkhart *et al.*

The legislature may authorize the acquisition of real estate for street, railroad, canal, or other public use, to be held by a fee simple title, and this may be acquired by grant, or by the exercise of the power of eminent domain. The character of the title acquired is merely one of legislative intention.

Cooley Const. Lim. 558; *Brooklyn Park Commissioners* v. *Armstrong*, 45 N. Y. 234; *Nicoll* v. *The New York, etc., R. R. Co.*, 2 Kern. 121; S. C., 12 Barb. 460; *Heyward* v. *The Mayor, etc., of New York*, 3 Seld. 314; S. C., 8 Barb. 486; *Embury* v. *Conner*, 3 N. Y. 511; *People* v. *Kerr*, 27 N. Y. 188; *In the matter of Peter Townsend*, 39 N. Y. 171; *In the matter of New York, etc., Co.* v. *Kip*, 46 N. Y. 546; *Rexford* v. *Knight*, 15 Barb. 627; S. C., 1 Kern. 308; *In the matter of the Water Commissioners* v. *Lawrence*, 3 Edw. Ch. 552; *De Varaigne* v. *Fox*, 2 Blatchf. C. C. 95; *Dingley* v. *The City of Boston*, 100 Mass. 544; *Commonwealth* v. *M'Allister*, 2 Watts, 190; *Haldeman* v. *Pennsylvania Central Railroad*, 50 Pa. St. 425; *Newcastle, etc., Co.* v. *Peru, etc., Co.*, 3 Ind. 464; *The President, etc., Co.* v. *The City of Indianapolis*, 12 Ind. 620; *Gillespie* v. *Broas*, 23 Barb. 370.

The following citations of acts of Congress, statutes of the State, etc., were made to show that the intention was to acquire a fee simple:

Subdivision three of section six, 3 U. S. Stat. at Large, 290; *id.* 424; 4 *id.* 47; *id.* 236; *id.* 416; *id.* 716; 5 *id.* 414; *id.* 542; *id.* 731.

Acts of 1828, 10; Acts 1829, 13; Acts 1830, 13; *id.* 172; sections 1, 2, 3, 4, 5, 9, and 13 of act of January 9th, 1832, Acts of 1832, 4; sections 1, 4, 6, 10, of act of February 6th, 1835, Acts of 1835, 25; section 4 of act of February 7th, 1835, Acts of 1835, 31; sections 1, 9, 10, 14, 16, 17, 18, 22, 23, 44 of the general internal improvement act of the 27th of January, 1836, 6, Acts of 1836, and R. S. 1838, 336; section 5, of the act of January 20th, 1842, Acts of 1842, 35; section 6 of the act of January 31st, 1842, Acts of 1842, 30; sections 1, 4, 9, 19, 23, 24, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 55, 58 of the act of February 28th, 1842, Acts of 1842, 3; section 4 of act of February 10th, 1843, Acts of 1843, 33; sections 248, 264, and 265 of article 16 of chapter 13 of the R. S. 1843, R. S. 1843, 272, 274, and 275; section 1 of act of January 10th, 1845, Acts of 1845, 9; sections 1, 2, and 3 of act of January 13th, 1845, Acts of 1845, 10; sections 8, 9, 10, and 33 of act of January 19th, 1846, Acts of 1846, 3; also Acts of 1847, 3, and 1 G. & H. 689; section 1 of act of January 28th, 1847, Local Acts of 1847, 260; section 3 of act of 19th of January, 1850, Acts of 1850, 21; sections 1 and 3 of act of January 21st, 1850, Acts of 1850, 22; the message of the governor to the 35th session of the general assembly that met December 30th, 1850; Documents, p. 113; joint resolution of February 7th, 1851, Acts of 1851, 200; sections 1, 6, 7, and 9 of act of February 13th, 1851, Local Acts of 1851, 358; preamble of the act of March 9th, 1859, Acts of 1859, 167, 1 G. & H. 210; the deed of the State to Francis A. Conwell, dated June 30th, 1851, conveying to the grantee the northern division of the Central canal. This is the conveyance mentioned in the preamble to the act of March 9th, 1859. Sections 1, 6, 8, and 9 of act of June 17th, 1852, Special Acts of 1852, 93, and 1 G. & H. 205; section 1 of act of November 16th, 1865, Acts of special session of 1865, 116; Act of January 15th, 1849, Local Acts of 1849, 73.

The State was providing a permanent system traversing the State, connecting the lakes with the Ohio river.

The State had no means of water communication, and railroads had not yet been developed. Real estate was of little or no value, the great body of it selling for Congress price. It was to be the property of the State. The State required in all cases that it should be the fee simple owner of the real estate upon which the water-power was leased, and necessarily would desire to hold the canal by as high a title as the real estate upon which the water was to be used for mill purposes.

In addition to this, the forty-fourth section of the act of 1836, requires that the act shall be "favorably and liberally construed."

The canal acts authorize the condemnation of a fee simple.

Section 8 of the act to incorporate The Jeffersonville and New Albany Canal Company, Local Acts of 1836, 243; sections 2 and 5 of the act to incorporate the Brookville and Richmond Canal Company, Local Acts of 1838, 159; sections 2, 3, 5, 7, and 18 of the act to incorporate The White Water Valley Canal Company, Local Acts of 1842, 37; section 14 of the act to incorporate The Indiana Canal Company, Local Acts of 1849, 98.

The acts creating the railroad companies chartered about the time of the enactment of the internal improvement act of 1836, authorized the condemnation of a fee simple for a right of way. The act to incorporate The Evansville and Vincennes Railroad Company, Local Acts of 1836, 149; the act to incorporate The Crawfordsville, Covington, and Illinois Railroad Company, Local Acts of 1836, 165; an act to incorporate The Princeton and Wabash Railroad Company, Local Acts of 1836, 183 ; an act to incorporate The Lafayette and Danville Railroad Company, Local Acts of 1836, 229; an act to incorporate The Perrysville and Danville Railroad Company, Local Acts of 1836, 227.

This has been the policy of the State as to all the important railroad lines; The Peru and Indianapolis Railroad Company, Local Acts of 1846, 210; The Terre Haute and Richmond Railroad Company, Local Acts of 1847, 77; The Indiana Central Railway Company, Local Laws of 1851, 80; The Ohio and Mississippi Railroad Company, Local Acts of 1848, 619; The Junction Railroad Company, Local Acts of 1848, 468; The Indianapolis and Bellefontaine Railroad Company, Local Acts of 1848, 176; The Jeffersonville Railroad Company, Local Acts of 1849, 364; Local Acts of 1850, 424; Local Acts of 1851, 520.

The same is the policy of the State, even under our general railroad laws.

Sections 1, 13, 14, 15, 16, 18, of the general railroad act of May 11th, 1852, 1 G. & H. 504.

The act of May 11th, 1852, is to be construed in connection with the chapter for "assessment of damages," 2 G. & H. 310.

*McMahon* v. *Cincinnati, etc., Co.*, 5 Ind. 413; *Board of Comm'rs of La Grange Co.* v. *Cutler*, 6 Ind. 354. This chapter authorizes the condemnation of a fee simple. Also act of March 7th, 1863, Acts of 1863, 33.

When real estate was taken by the State, by condemnation, for the Central canal, the owner was paid the full value of his land. No interest less than a

The Water Works Company of Indianapolis *et al. v.* Burkhart *et al.*

fee simple absolute was considered, in estimating the owner's damages. In *Vanblaricum* v. *The State*, 7 Blackf. 209, the rule is stated thus: "In estimating the complainant's damages, the jury were to ascertain the value of his land, taken for the canal, at the time it was taken."

See, also, *M'Intire* v. *The State*, 5 Blackf. 384; *The State* v. *Digby*, 5 Blackf. 543; *The State* v. *Beackmo*, 8 Blackf. 246; *Kimble* v. *The White Water Valley Canal Co.*, 1 Ind. 285.

See also, on this subject, Angell on Highways, sec. 115 (2d ed.).

In the case of *Kimble* v. *The White Water Valley Canal Co.*, 1 Ind. 285, which was a condemnation under the charter of that company, hereinbefore set out, it is said: "After such assessment of damages, and the payment thereof, the property taken is evidently intended to be vested permanently in the company."

All the statutes upon the subject of canals, being *in pari materia*, must be construed together, to ascertain the legislative intention as to the character of the interest the state acquired in canal lands. *The State* v. *Beackmo*, 8 Blackf. 246; *Rexford* v. *Knight*, 15 Barb. 627; S. C. on appeal, 1 Kernan, 308; *Commonwealth* v. *M'Allister*, 2 Watts, 190; *Haldeman* v. *Pennsylvania Central Railroad*, 50 Pa. St. 425.

In New York and Pennsylvania, from which our system is borrowed, the state acquired a fee simple absolute, in the lands acquired for canal purposes, whether by condemnation or deed. *Baker* v. *Johnson*, 2 Hill N. Y. 342; *The People* v. *Hayden*, 6 Hill N. Y. 359; *Rexford* v. *Knight*, 15 Barb. 627; *Rexford* v. *Knight*, 1 Kernan, 308; *Gillespie* v. *Broas*, 23 Barb. 370; *In the matter of the Water Commissioners* v. *Lawrence*, 3 Edw. Ch. 552; *Commonwealth* v. *M'Allister*, 2 Watts, 190, 197, 198; *Union Canal Company* v. *Young*, 1 Whart. 410; *Haldeman* v. *The Pennsylvania Central Railroad*, 50 Pa. St. 425; *Plitt* v. *Cox*, 43 Pa. St. 486; *North Branch Canal Company* v. *Hireen*, 44 Pa. St. 418.

The question of change of legislative policy presented in *Edgerton* v. *Huff*, 25 Ind. 35, was presented both in New York and Pennsylvania, as shown by the cases cited. The legislation of those states is so strikingly like ours in its changes, that we infer that our State followed them step by step.

The case of *Edgerton* v. *Huff*, 25 Ind. 35, was incorrectly decided, if the State acquired a mere easement.

There was no water on the land until the State brought it there, and the landowner was paid for the burden of having his land used for the passage of the water. The State necessarily acquired the absolute proprietorship of the water in the canal. The uses to which it was to be applied forbade a divided ownership.

The statutes show that the exclusive possession and use were in the State, and that the land-owner was excluded from the use of the banks of the canal.

The land-owner was not in the position of a riparian proprietor.

The cases cited by the court were between the State and the owners of the bed of the water-course from which it was proposing to take water.

They do not present the question as to the right to the water after it got into the canal, except the New York case, and that is overruled. They cited *The Staffordshire, etc., Co.* v. *The Birmingham, etc., Co.*, 35 Law. J. (N. S.) Ch. 757; 1 N. S. Law Rep. H. L. 254; and *Hatch* v. *The Cincinnati, etc., R. R. Co.*, 18 Ohio St. 92.