CROMIE v. THE BOARD OF TRUSTEES OF THE WABASH AND ERIE CANAL.

No. 6784.

CANAL — *Wabash and Erie Canal.—Title Acquired by State in Land Appropriated.—Stare Decisis.*—The decision of this court in the case of *The Water Works Co.* v. *Burkhart,* 41 Ind. 364, that the State acquired the fee simple to the lands appropriated for the construction of the Wabash and Erie Canal, having become a rule of property in this State, is affirmed. BIDDLE, J., dissents.

SAME — *Right to Take Ice.—Contract.—Revenue.*—The board of trustees of the Wabash and Erie Canal, by a written agreement with A. and certain other parties, partners by the name and style of the Wabash and Erie Canal Company, for a consideration named therein, transferred, for a specified time, "all the tolls and revenues to be derived, or which might accrue, from" the use of such canal, after the payment therefrom of certain expenses and expenditures stipulated for therein, under which agreement such company took possession thereof. A., as a member of such company, during the existence of such agreement, took from such canal large quantities of ice formed therein.     Suit by such board of trustees against A. to recover the value thereof.

*Held,* that the board of trustees could not recover.

*Held,* also, that the word "revenue" is broad enough to cover income derived from the ice formed in the canal during such agreement.

*Held,* also, that such company, under such contract, was as much entitled to the ice and the proceeds thereof as it was to the tolls or water rents.

From the Tippecanoe Circuit Court.

*J. M. Larue,* for appellant.

*R. Jones,* for appellee.

WORDEN, J.—Complaint by the appellee, against the appellant and Oliver H. Cassman, as follows:

" The Board of Trustees of the Wabash and Erie Canal complains of Oliver H. Cassman and John P. Cromie, and says, that on the 1st day of November, 1868, and from that day to the bringing of this suit, the plaintiff was, and still is, entitled to the exclusive possession of the part of the Wabash and Erie Canal which is within said county, and during all said time was and is the exclusive owner of all the ice formed in the same ; that on the said 1st day of November, 1868, and at divers times between that day and the commencement of this suit, the defendants wrongfully entered upon said canal within said county, and took and carried away therefrom large quantities of ice formed in said canal, and the property of said plaintiff, and sold and disposed of the same as an article of merchandise ; that said ice so taken amounted in the whole to a large quantity, to wit, one million tons of ice, and the same was sold at a net profit of one hundred thousand dollars, and said ice was of that value." Prayer for an injunction, and for judgment for damages in the sum of one hundred thousand dollars.

We will state enough of the subsequent pleadings to develop the main points in the case, and the ground on which it must be decided.

The defendants answered :

1. By a general denial ;

2. " That said John P. Cromie was, during all the time complained of in said plaintiff's complaint, the owner in fee of a certain part of the lands covered by the waters of said canal known as the ' wide water,' being that part of lot No. 7 of school section 16, in township 23 north, of range 4 west, which is covered by said canal and wide water ; and also of the part of the lands covered by the waters of said canal known as ' lower wide water,' near the mouth of Wea creek, being that part of the north-west quarter of section 34, township 23 north, of range 5 west,

and of the east half of the north-east quarter of section 35 in said township and range, which is covered by the said canal and said lower wide water, subject only to the easement in said plaintiff to use said canal for the purpose of navigation, and for hydraulic purposes; that, being such owner, said Cromie employed the defendant Cassman to cut ice thereon; that, in cutting said ice, no damage whatever was done to any part of said canal, nor was the said easement in any manner interfered with, nor the use of said canal by said plaintiff obstructed or in the least disturbed. And the defendants deny that they, or either of them, cut ice upon or removed the same from any other part of said canal than the portions so owned in fee by said Cromie as aforesaid. Wherefore," etc.

The ninth paragraph of the answer is too long to set out in full, but it alleged, in substance, among other things, that the defendant Cromie, on the 1st day of May, 1866, together with sundry other persons, entered into a written agreement, a copy of which is set out, for the purpose of forming a partnership to secure the repair and maintenance of the Wabash and Erie Canal from the Ohio State line, westwardly, to Terre Haute, Indiana; that on the 23d day of June, 1866, the partners exhibited their contract to the plaintiff herein, who approved the same and entered into an agreement with said partners, by which it transferred, for the consideration therein named, all the profits of said canal to said partners, a copy of which agreement was filed; by which agreement the plaintiff parted with all the right and control of the canal in Tippecanoe county from the 1st day of July, 1866, to the 1st day of July, 1878, which time has not expired, and the partners took possession of the canal in 1866 under the agreement, and held the same until after the ice left the canal in the spring of 1874, and until after the acts complained of were committed.

The agreement between the plaintiff and the partners will be stated more fully when we come to consider the sufficiency of this paragraph of answer.

Demurrers for want of sufficient facts were sustained to the second and ninth paragraphs of answer above noticed.

Issues were joined and the cause was tried by a jury, resulting in a verdict for the defendants. Cassman had judgment in his favor on the verdict, but the plaintiff obtained a new trial as to Cromie; and upon a second trial the plaintiff obtained a verdict against Cromie for $6,750, on which judgment was rendered.

Errors are assigned, among other things, upon the ruling in sustaining the demurrers to the second and ninth paragraphs of answer.

The question arising under the second paragraph is whether the State acquired the fee simple to the land occupied by the Wabash and Erie Canal, and, therefore, whether the fee simple passed from the State to the trustees of the canal; or whether the interest thus acquired and transmitted was a mere easement.

In the case of *The Water Works Co., etc.*, v. *Burkhart*, 41 Ind. 364, it was decided that the State acquired the fee, and not a mere easement. That was a thoroughly considered case, and we think the decision binding upon us, as having become a rule of property, and do not feel justified in again entering upon an examination of the question as an open one. We may remark, however, that since that decision two cases have been decided in other States in accordance with it. *Malone* v. *The City of Toledo*, 34 O. S. 541, and *Wyoming Coal, etc., Co.* v. *Price*, 81 Pa. St. 156. The latter case strongly supports the *Burkhart* case in construing the various statutes on the subject as *in pari materia*.

It is about nine years since the case of *The Water Works Co., etc.*, v. *Burkhart*, was decided. In the mean time, large rights may have been acquired on the faith of that decision,

that would be utterly destroyed by overruling it. The case is one of the class to which the doctrine of *stare decisis* applies with all its force. It was said by the Supreme Court of the United States, in *Goodtitle* v. *Kibbe,* 9 How. 471, 478, that "it must be a very strong case indeed, and one where mistake and error had been evidently committed, to justify this court, after the lapse of five years, in reversing its own decision; thereby destroying rights of property which may have been purchased and paid for in the mean time, upon the faith and confidence reposed in the judgment of this court." See also the case of *Rockhill* v. *Nelson,* 24 Ind. 422. We therefore adhere to the decision in the case of *The Water Works Co., etc.,* v. *Burkhart, supra,* and decline to re-examine the question thus decided.

There was no error in sustaining the demurrer to the second paragraph of answer.

We pass to the ninth paragraph.

The contract made a part of this paragraph is a long one, and we set out so much of it only as seems to have a bearing upon the question involved. It contains a preamble, concluding as follows:

"*Therefore,* To secure the repair and maintenance of said canal, and to preserve, maintain and keep the same for the use of the people of the State of Indiana, and to protect the rights and interests of the bondholders therein, the said Board of Trustees of the Wabash and Erie Canal do make the following agreement:" Then follows the agreement, of which we set out the following parts :

"This agreement between the Board of Trustees of the Wabash and Erie Canal, in the State of Indiana, of the first part, and *Alfred P. Edgerton, Reed Case, Luther Jewett, Robert Breckinridge* and *Mentor Bradley,* citizens of said State of Indiana, and their associates, partners under the name and style of The Wabash and Erie Canal Company,

organized at Delphi, Indiana, May 26th, 1866, of the second part, witnesseth :

" That the said Board of Trustees, for the purpose of preserving as far as in their power the navigation of that part of said canal, from the lower lock in the city of Terre Haute to the Ohio State line, do hereby set apart and apply for the use of said Wabash and Erie Canal Company, contractors, all the tolls and revenues to be derived, or which may accrue, from the above specified part of the canal, during the term of this agreement, with full power to collect and use the same for the purposes herein stated.

" In consideration whereof the said contractors do hereby agree and bind themselves to maintain and preserve the navigation of that part of said canal hereinbefore specified, from the 1st day of July, 1866, until the 1st day of July, 1878, and to keep and preserve the same in good order for use, with all its structures, within the limits specified, including locks, dams, dam abutments, aqueducts, culverts, waste-wiers and embankments, and all the works appurtenant to said canal, and which the Board of Trustees are required to keep, maintain, and preserve. 	*	*	*
Collectors of toll and revenues shall be appointed by the board of trustees, upon the recommendation of the parties of the second part, who shall also determine the number, location, compensation, time and manner of payment of the same.

" The contractors shall choose one of their number as a general manager, whose compensation shall be fixed by them, and paid as herein stated. He shall keep his office at Fort Wayne until otherwise agreed by the parties hereto, which shall be the general business office of the company. His duties shall extend to a general supervision of the canal and its business, as the representative of the contractors, and to the current and ordinary repairs and maintenance of the canal, and to a rigid watchfulness

over the expenditures of the several districts, and to such other matters as may be assigned him by the contractors.    *    *    *    *    All the tolls and revenues of that portion of the canal embraced in this contract shall be received and collected by the collectors appointed and commissioned by the board of trustees, and shall be deposited in such national or state banks most convenient to the collectors' offices, as may be selected by said contractors, to the credit of the Board of Trustees of the Wabash and Erie Canal, for the use of the Wabash and Erie Canal Company, for the purposes herein stated, and no other. An accurate account shall be kept by the trustees, in their office at Terre Haute, of all said receipts, and of all disbursements; and all the moneys shall be applied to the uses and purposes contemplated in this agreement, and shall be held in trust by said trustees for such uses and purposes only.    *    *    *    *

"All payments for repairing and preventing of breaks, repairing or rebuilding lock gates, for the regular boat forces, for cleaning out the canal, for lock tending, watchmen, and all other regular and ordinary repairs, expenses, and all repairs made by the district superintendents, shall be made by the Board of Trustees from the funds collected and deposited as aforesaid, upon the certificate or order of the general manager of the contractors, every sixty days from the 1st day of July, 1866.    *    *    *    *

"Whenever, from insufficiency of revenues, the contractors shall make any advances of money for any of the purposes herein designated, the amount thereof, with interest, shall be repaid to them from the revenues first thereafter collected and deposited as aforesaid.    *    *    *    *

"And it is also expressly understood, that no obligation or debt shall be created by said contractors against this division of the canal during the existence of the present contract, except for advances made as aforesaid; and the

trustees will not be responsible in any manner for any losses to said contractors, by reason of this undertaking; the said contractors agreeing to take the tolls and reve- nues as a full compensation.    *    *    *    *

" There shall be no change or interference on the part of the contractors with the existing leases of water-power by the trustees or the State, except upon consultation and mutual agreement with said trustees; and at all times, when the streams from which the canal derives water will admit, it shall be supplied as the trustees are now bound to supply it; and all water rents shall be charged and col- lected by the collectors as heretofore, and for the use of said contractors; and said trustees, upon failure of any lessee to make payment of rent when due, shall, upon application of the contractors, proceed to enforce at once the payment thereof according to law, at the expense, if any, of said contractors. It is expressly understood that any and all moneys arising from the tolls and revenues of the canal, which, at the end of each and every year during the existence of this contract, have not been drawn for and applied to the uses and purposes designated herein, shall belong to the contractors, parties hereto, for the purposes of this contract, and shall be paid over to said contractors, reserving by mutual consent enough of said moneys to meet current repairs, having in view the permanent maintenance of said canal, which amount so reserved shall not be less than twenty-five thousand dollars.

" The compensation of the following officers shall be paid out of the tolls and revenues of said canal, to wit : The general manager of the contractors, and the contin- gent expenses of his office, and such other expenses as shall be allowed him by the contractors; the collectors, district superintendents, lock tenders, and such other agents as may be appointed by the contractors, which said compen- sation shall be paid on the order of the general manager

of the contractors, in quarter-yearly payments from the time this contract takes effect; also the sum of eight thousand five hundred dollars per annum towards the general expenses of the trust from the first day of July, 1866, payable quarterly."

We assume the validity of the contract, as no objection to it has been made. There can be no doubt that, by its terms, the contractors, The Wabash and Erie Canal Co., were entitled, for their own use, to the proceeds of all the tolls and revenues which might accrue from the specified portion of the canal, during the time provided for by the contract, after paying the expenses of keeping the canal in repair, and such other expenses as were stipulated for. The contract amply provides for the necessary application of the proceeds of tolls and revenues to the payment of expenses of keeping the canal in repair, and such other expenses as are provided for, and contemplates that any residue shall go to the contractors.

Having executed the contract, what right, it may be asked, have the trustees of the canal to the ice that might be formed in it during the existence of the contract? We think the trustees had no such right, but that the right to the ice passed to the contractors, just as much as any other portion of the revenue " to be derived, or which might accrue, from " the specified portion of the canal. The ice may have been a source of revenue, as much as water rents or any thing else pertaining to the canal. The word " revenue" is broad enough to cover income derived from the ice in the canal. The first definition of the word given by Worcester is " Income or annual profit received from lands or other property."

The ice in the canal is as much a part of the canal as the water in a fluid state, and the water as much a part of the canal as the ground on which it rests, or the embankments, locks, etc.

It may be, that, as between the trustees and the contractors, the trustees had the right to require that the proceeds of the ice should be deposited in the manner provided for by the contract, in order that they might be used, if necessary, in paying expenses of keeping up the canal, and the other expenses provided for, before the distribution of any surplus to the contractors; but, if so, that was a matter between the trustees and the contractors, about which no question arises here.

The contractors were as much entitled to the ice and the proceeds thereof as they were to the tolls or water rents; and, by one of their number, Cromie, they have received the same. Cromie may be responsible to his co-contractors for their respective shares of the proceeds of the ice, but he is not responsible to the trustees of the canal therefor.

For these reasons, we think the court below erred in sustaining the demurrer to the ninth paragraph of answer.

The judgment below is reversed, with costs, and the cause remanded for further proceedings in accordance with this opinion.

NOTE.—HOWK, J., having been of counsel in the cause, did not participate in the decision.

### DISSENTING OPINION.

BIDDLE, J.—I am constrained to dissent from the opinion of a majority of the court.

1. I deny that the State of Indiana took a fee simple in the bed, embankments and lands attached, for the purposes of the Wabash and Erie Canal, or in any portion of them.

2. I hold, that the State took but an easement in said lands, and only for the purposes of said canal; and that, when the use of the canal was abandoned as a public work, the land reverted to the original owners, from whom it was taken.

3.  I hold, that, if the State did take a fee in said lands, it was only for the purposes and uses of the canal as a public work, and that the State never had any power, nor have her vendees any power, to convert it, or any part of it, to a private use.

4.  I hold, that the State has no power, either directly or indirectly, to take the land of one citizen, whether it be an easement or a fee, and transfer it, either directly or indirectly, to another citizen, even on making full compensation therefor.

5.  I hold, that the State has no power to take property against the will of the owner, whether an easement or a fee, and, if so taken, has no power to hold. it, except for a public use; and that the vendees of the State can stand in no better light than the State herself.

6.  I hold, that neither the State nor her vendees ever had any power to divert the water from the canal for the purpose of supplying a city with water-works; nor to use the water for the purpose of producing ice for sale as merchandise. Because neither water-works nor ice ponds have any connection with the uses and purposes of a canal.

7.  I hold, that, to adhere to the doctrine of the *Burkhart* case, will produce incalculably greater injury than to overrule it.

In support of the first and second propositions, which may be treated together, I refer to my dissenting opinion in the case of *Nelson* v. *Fleming*, 56 Ind. 310, and the authorities there cited, to which I wish to add something, as the cases are not the same. At the time that case was decided, the use of the canal as a public work was not known to have been abandoned; but since that time its abandonment has become an accomplished public fact, which the courts must judicially notice; nor was the question of fee or easement in the property necessary to the decision of that case; for, as long as the vendees of the

State kept up the canal for public use as a canal, their title would be good, whether they held a fee or merely an easement in the lands. Besides, there was no question in that case of diverting the water from the canal for the purpose of a water-works, nor of cutting and selling ice from its waters, as merchandise.

*In the matter of Albany Street, in the city of New York*, 11 Wend. 149, it was held that the Legislature could not authorize the taking of more property or a greater estate therein than necessary. for the public use. See, also, *In the matter of John and Cherry Streets*, 19 Wend. 659.

The language of the statute, under which the Wabash and Erie canal was constructed, is as follows :

" That it shall and may be lawful for said canal commissioners, or each of them, or any of their agents, superintendents, engineers, or workmen acting under them, to enter upon and take possession of, and use all and singular, any lands, waters, streams and timber, stone or materials of any kind, necessary for the prosecution of the improvements contemplated by this act; and to make all such canals, feeders, dikes, locks, dams, and other works, as they may think proper in said prosecution, doing however no unnecessary damage."

This specific language would be wholly unnecessary, if the State intended to take a fee in the lands; and the concluding words, " doing however no unnecessary damage," if a fee was contemplated, would be not only useless but senseless. And, in assessing the damages to the owner by taking his land, the jury were " faithfully, justly and impartially to estimate the loss or damage, if any, over and above the benefit accruing from the canal to such owner." These words are wholly inconsistent with the intention of taking a fee in the lands; for, if a fee was intended to be taken, they would simply assess the value of the land, without deducting any benefit to the owner

that might arise from the construction of the canal. And, the State not needing any greater estate in the lands so taken for the purposes of constructing a canal than an easement, it can not be presumed that she intended to take any greater estate, unless the words of the act are so apt and controlling in defining a fee simple, that they would admit of no other construction. "The improvements contemplated by this act" did not require that the State should take a fee in the lands upon which the improvements were to be constructed. It appears plain, therefore, that the State neither took, nor intended to take, a fee in the lands. To call it a fee, when in fact and in law it is only an easement, has no force whatever.

As to the third proposition—that neither the State nor her vendees can convert the canal to any other use than for the purposes of a canal—we have legislation upon the subject. The act of March 9th, 1859, providing for the incorporation of canal companies, 1 R. S. 1876, p. 249, provides as follows:

"Sec. 14. That any company or companies organized under this act, and obtaining possession of any canal or part thereof, heretofore built within this State, under a grant, lease, or gift of the same, from the parties who built the same, or were the owners, legal or equitable, of the same at the time of said grant, lease, or gift, shall not be allowed or permitted to change or divert the same to any other use or purpose from that for which said canal was originally built and constructed, but the same shall for all time to come, except when undergoing repairs, be kept navigable, a public highway, free to all persons whatever to pass and repass with their boats or other water crafts, and with their produce, goods and chattels, wares and merchandise, such persons conforming to such rules and regulations as the company may prescribe, and to the payment of such tolls as may be established and required for the

navigation of the same; and any such company or companies changing or diverting said canal to any other purpose than navigating the same with boats and other water craft, in the transportation of persons or property along said canal, shall forfeit all rights, privileges and immunities granted under this act; and the change and diversion of said canal to any other purpose than as provided in this section, to wit, a navigable canal for boats and other water craft, in the transportation of persons and property along the same, shall work as a forfeiture of any grant, lease, or gift made under the provisions of this act.

"Sec. 15. All canal companies now in existence in this State, or which shall hereafter be organized, may have and possess all the benefits of this act, by complying with the conditions herein contained."

We need not enquire whether the Wabash and Erie Canal, or the company which now claims it, comes under the provisions of this act; it declared the policy of the State in reference to all her canals, before the present owners purchased the Wabash and Erie Canal, and has been in force ever since. They are bound by the act, though they may not be a company organized under it. We can not suppose that the State intended to have one law to govern one canal, and another law to govern another canal; indeed, such an act would be unconstitutional. The State and the public have no interest in canals except as canals, and it is not for the courts, by their decisions, to take any one of them out of the operation of the general law. By the legislation of 1846 and 1847, known as the "Butler Bill," by which the canal was transferred to the appellees, they were bound to complete it to Evansville, and to maintain it as a canal, throughout its entire length; subject, however, to the control of the State in regulating its navigation and tolls; the appellees are bound, therefore,

by this act, as much as if they were named therein. The acts must be construed *in pari materia*, and the intention of the Legislature must govern; and surely that intention never was, to allow its system of public improvements to end in supplying private companies with water for water-works, and producing ice for individuals as merchandise.

And we have judicial decisions directly in point upon this question, namely, that neither a canal, its water, nor any thing else necessary to its use, can be diverted from its legitimate purpose. In the case of *Cooper* v. *Williams*, 4 Ohio, 253, Williams, as canal commissioner, undertook to divert a portion of the water from Mad river through the canal, without returning it again for use in the river or canal, and it was held that he could not so divert the water to the injury of a riparian owner. This case was sought to be reviewed (*Cooper* v. *Williams*, 5 Ohio, 392,) and the court used the following language:

" Although the law authorizes them" (the canal commissioners) " in some cases, to dispose of the water, for hydraulic purposes, with a view to raise a revenue, to aid in defraying the expenses of this work, still this relates only to the water which is necessary for the navigation of the canal, and which can be used for these other purposes without inter-, fering with that navigation. It does not authorize them to receive a surplus quantity of water into the canal, that they may dispose of it; especially when an injury should be thereby done to an individual.     *     *     *     A riparian proprietor possesses the same right to the *use* of water flowing through his land, that he does to the land itself. The water itself is not his. It is the use. And in this use he can not be disturbed by an adjoining proprietor, either above or below him.     *     *     *     But as the *public welfare* does not require that any more should be with-drawn from the river than is necessary for the navigation of the canal, no more can be taken; and should an attempt

be made to take more, this court might prevent it by injunction."

In the case of *Buckingham* v. *Smith*, 10 Ohio, 288, it was held that the canal commissioners are authorized by law to take water enough from a stream for canal navigation, but not for the purpose of creating hydraulic power to sell or lease on behalf of the State. In this case the court stated its conclusions as follows:

" The State, notwithstanding the sovereignty of her character, can take only sufficient water, from *private streams*, for the purposes of the canal. So far the law authorizes the commissioners to invade private right, as to take what may be necessary for canal navigation, and to this extent authority is conferred by the constitution, provided a compensation be paid in money to the owner. * * * We know of no instances in which it has, or can be taken, even by State authority, for the mere purpose of raising a revenue by resale, or otherwise; and the exercise of such a power would be utterly destructive of individual right, and break down all the distinctions between *meum et tuum*, and annihilate them forever, at the pleasure of the State."

The same principle is recognized, illustrated and elaborately stated by the Chancellor, in the case of *Gardner* v. *The Trustees of Newburgh*, 2 Johns. Ch. 162, decided in 1816. See also *Varick* v. *Smith*, 5 Paige, 137.

If the State can not grant authority to draw water from a canal for hydraulic purposes, without returning it to the canal for the purposes of navigation, it certainly can not sell water to a water-works company, nor fill ponds for ice merchants; for, in such instances, the water can not be returned to the canal for any purpose.

The fourth proposition is supported by a long line of authorities. The taking and use must be for the public; and, if the thing taken be transferred to a private use, it

will revert.   *Beekman* v. *The Saratoga, etc.,* R. R. Co., 3
Paige, 45;  *Hepburn's  Case,* 3 Bland, 95; *Pittsburgh*
v. *Scott,* 1 Pa. St. 309; *Bankhead* v. *Brown,* 25 Iowa,
540; *Nesbitt* v. *Trumbo,* 39 Ill. 110; *Osborn* v. *Hart,* 24
Wis. 89; *Harding* v. *Goodlett,* 3 Yerg. 40; *Norman* v.
*Heist,* 5 Watts & S. 171; *Embury* v. *Conner,* 3 N. Y. 511;
*The L. C. & C. R. R. Co.* v. *Chappell,* 1 Rice, 383; *Ru-
bottom* v. *McClure,* 4 Blackf. 505.

Having established this principle beyond controversy, as
I think, let us apply it to the case before us. If the Legis-
lature were to directly pass an act authorizing lands to
be taken from the owner against his consent, providing
means to pay him the full value of the fee, declaring that
it shall be used to construct a canal for the purpose of
furnishing water to a private corporation to supply a city,
or to make ice ponds for a private person to produce ice
to sell as merchandise, no one would contend for a mo-
ment that the act was constitutional; yet to this we have
indirectly come by the decision of the *Burkhart* case, and
the present decision based upon it.

The same argument and the same authorities support
the sixth proposition.

These principles are not of to-day merely; they are
founded in nature, and recognized by every civilized na-
tion where the rights of property are respected.   The old
publicists, Grotius, Puffendorff, Montesquieu, Vattel, have
adopted them as the basis of the law of property, and
modern commentators explain and illustrate their ap-
plication.

Blackstone, in speaking of the right of property, says:

"The third absolute right, inherent in every English-
man, is that of property : which consists in the free use,
enjoyment, and disposal of all his acquisitions, without any
control or diminution, save only by the laws of the land.
*    *    *    *    And by a variety of ancient statutes

it is enacted, that no man's lands or goods shall be seized into the king's hands, against the great charter, and the law of the land.        *        *        *

" So great moreover is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without consent of the owner of the land. In vain may it be urged, that the good of the individual ought to yield to that of the community; for it would be dangerous to allow any private man, or even any public tribunal, to be the judge of this common good, and to decide whether it be expedient or no. Besides the public good is in nothing more essentially interested, than in the protection of every individual's private rights, as modelled by the municipal law. In this and similar cases, the Legislature alone can, and indeed frequently does, interpose, and compel the individual to acquiesce. But how does it interpose and compel ? Not by absolutely stripping the subject of his property in an arbitrary manner, but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual for an exchange. All that the Legislature does is to oblige the owner to alienate his possessions for a reasonable price ; and even this is an exertion of power, which the Legislature indulges with caution, and which nothing but the Legislature can perform." 1 Cooley's Bl. Com. 139.

In a note to the above, by the American editor, we find the following :

" It is well settled that government has no right to take

the property of one citizen and transfer it to another, even on the making of full compensation."

Chancellor Kent, upon the same subject, uses the following language :

" The right of eminent domain, or inherent sovereign power, gives to the Legislature the control of private property for public uses, and for public uses only.     *     *     *     So lands adjoining the New York canals were made liable to be assumed for the public use, so far as was necessary for the great object of the canals.     *     *     *

" It undoubtedly must rest, as a general rule, in the wisdom of the Legislature, to determine when public uses require the assumption of private property; but if they should take it for a purpose not of a public nature, as if the Legislature should take the property of A. and give it to B., or if they should vacate a grant of property, or of a franchise, under the pretext of some public use or service, such cases would be gross abuses of their discretion, and fraudulent attacks on private right, and the law would be clearly unconstitutional and void." 2 Kent Com. 339, 340.

In the case before us, the appellants have vacated a grant of property and a franchise, which, according to the language of Kent, is a gross abuse of their discretion, and a fraudulent attack upon private property; and that such a law would be clearly unconstitutional.

As to the seventh proposition : I understand the majority of the court to approve of this decision mainly because the principle laid down in the *Burkhart* case has become a rule of property, and that to overrule it would disturb rights acquired upon the faith of that decision. The learned judge who wrote this opinion thinks it is supported by the cases of *Wyoming Coal, etc., Co.* v. *Price*, 81 Pa. St. 156, and *Malone* v. *The City of Toledo*, 34 Ohio 541; but I do not see wherein these cases aid the opinion

Cromie *v.* The Board of Trustees of the Wabash and Erie Canal.

before us. The question involved in the Pennsylvania case was whether the State acquired a fee in the lands taken for a canal, when it was so provided and paid for; and whether the vendee of the State owned the coal under the bed of the canal. There was no question of abandonment in the case, nor of furnishing water-works, nor of selling ice. If the State took a fee in the lands, it does not follow that she can sell water from the canal to supply water-works or fill ice ponds, because these are not the purposes for which canals are constructed. The general public that builds and owns the canal has no interest in private water-works, nor in the ice traffic; and the State has no power to use the canal for any such purposes. It is a power not contemplated by the constitution or the acts under which the canal was constructed; and when such power is used, or attempted to be used, the courts will interfere and redress or prevent the wrong.

In the Ohio case, the simple question was, whether the State acquired a fee in certain lands taken for canal purposes or not. There was no question of abandonment, water, or ice involved; and the court says, that " Where the property is confessedly unnecessary for the purpose for which it was taken, or is for a mere private use, no doubt the courts may interfere."

In the case we are considering, certainly the cutting of the ice was for a private use, which in no way subserved the purposes of the canal; and in this it seems to me, the case is rather against the decision in this case than in its favor.

I feel as firmly bound by the doctrine of *stare decisis* as any of my honored brothers. I admit that when a question has once been decided, and maintained through a long course of time, whereby it has become a rule of property, it should not be overruled, though wrong, unless overruling it would be a lesser evil than that of main-

Cromie v. The Board of Trustees of the Wabash and Erie Canal.

taining it. But is the *Burkhart* case of this character? It does not seem to me that it is. It was never accepted as settled law, but has been in dispute during the eight years since it was decided and the, principle in the *Huff* case, which it overruled—namely, that the owner had a reversionary interest in the lands taken without his consent, for public improvements—has been recognized since that decision by this court in three cases : *The Indianapolis, etc., R. R. Co.* v. *Ross*, 47 Ind. 25 ; *Cox* v. *The Louisville, etc., R. R. Co.*, 48 Ind. 178 ; and *Sharpe* v. *The St. Louis and S. E. R. W. Co.*, 49 Ind. 296. It is clear that the *Burkhart* case can not be sustained on principle; must grounds of policy then uphold it?

I confess that I can foresee no serious evil that will be likely to occur upon overruling the *Burkhart* case. Those who have acquired rights under that decision, which have been adjudicated, could not be disturbed in their property, because the question as to that is settled forever ; and it is not likely that many investments of property have been made upon the faith of that case. While to overrule the case and restore the law to a basis of principle, where it stood before that decision was made, would give security to the rights acquired during forty years before it was rendered.

Now let us see what evils must necessarily follow, if the rule of property in the *Burkhart* case is maintained. It decides that the State took a fee simple in the bed and embankments of the Central Canal, running, perhaps, some hundred miles, more or less, the greater portion of which has reverted to the owners of the land, from whom it was taken, has been filled up and fields extended over it, and perhaps buildings erected upon it, all of which have been enjoyed more than thirty years without hindrance from any one, or any claim on the part of the State. If the principles of the *Burkhart* case are to be maintained as

the law of property in the grounds of this canal, I do not see why any of these proprietors, numbering hundreds doubtless, may not be ejected from their premises, whenever the State or her vendees see proper to assert their claims. And if the Wabash and Erie Canal, some three hundred miles in length, with its thousand claimants to its bed and embankments, who have enjoyed their property in peace for nearly half a century, supposing that it was subject only to the easement of the canal, is to be put under the rule of property laid down in the *Burkhart* case, then the evil will be great indeed. I can not consent to any such a rule.

NIBLACK, C. J.—If the question as to the kind of title which the State acquired by the appropriation of the lands necessary for the location and construction of the Wabash and Erie Canal were an entirely open one, I would hesitate to consent that the title thus acquired amounted to any thing more than an easement; but I concur in holding that the case of *The Water-Works Co. of Indianapolis* v. *Burkhart*, *supra*, maintaining a different doctrine, has become a rule of property in this State, and ought not now to be overruled.

SCOTT, J., concurs in what is said by NIBLACK, C. J. as above.

Petition for a rehearing overruled.